In 2001, the Department of Human Resources ("DHR") investigated a complaint alleging that Damon Dye and Melissa Headrick, who were then employees of the Shades Valley YMCA, had been guilty of child neglect by allowing a four-year-old boy to be left without supervision at a skating rink on a YMCA-sponsored field trip. DHR determined that findings of neglect were "indicated" as to both individuals. See § 26-14-8(a)(1), Ala. Code 1975. Dye and Headrick requested a hearing pursuant to § 26-14-7.1(3), Ala. Code 1975.
Following separate hearings before the same administrative law judge ("ALJ"), the ALJ determined that the neglect allegation against Headrick was "not indicated" but that the neglect allegation against Dye was "indicated." Dye appealed to the Jefferson Circuit Court, raising two issues: that responsibility for the child's being left at the skating rink lay with the faulty procedures of the YMCA or with Headrick, his supervisor, and that the ALJ erred by prohibiting him or his attorney from attending the hearing of his codefendant Headrick, thus denying him access to exculpatory evidence.
The circuit court reversed the determination by the ALJ and entered a judgment in favor of Dye. The circuit court's judgment states:
 "The Court finds in favor of [Dye] on all issues presented for review, and herein reverses the ruling of the [ALJ] to a finding of `NOT INDICATED' with regard to all charges brought against [Dye]. . . . In reversing the underlying [administrative determination], it is this court's intention to relieve [Dye] from placement on the State of Alabama child-abuse-and-neglect registry."
DHR appeals to this court; we affirm.
For a summary of the facts of this case, we use the ALJ's "Findings of Fact" without omission, but with the addition of certain undisputed facts indicated in brackets: *Page 423 
 "The Shades Valley YMCA operated a Christmas camp during the December 2000 holiday time. Mr. Damon Dye was at that time employed at the Shades Valley YMCA as a counselor. Ms. Melissa Headrick was at that time employed as the program coordinator at the Shades Valley YMCA.
 "The director of the YMCA programs had left the Shades Valley YMCA two or three days prior to December 27, 2000. As a result of her departure, Mr. Dye and Ms. Headrick, in addition to their normal job titles, also carried the working title of interim director. As such, Ms. Headrick had overall responsibility for the Christmas camp being operated at that time. Mr. Dye had other responsibilities including the Indian Guide program.
 "Jacob Cotton (DOB 10/25/96) and his brother Zack Cotton (DOB 5/7/95) were enrolled in the Christmas camp at the Shades Valley YMCA. On December 27, 2000, a field trip to a skating rink was planned for the children who attended the Christmas camp.
 "Two buses were used to transport the children to and from the skating rink. Ms. Headrick drove one bus and Mr. Dye drove the other. The driver of the bus is the individual with primary responsibility for the children on the bus. Mr. Dye transported 21 children and two [19-year-old] counselors on his bus. Jacob Cotton was a passenger on Mr. Dye's bus.
 "At the time of the incident in question, the procedure in place at the YMCA program for checking children on and off the bus consisted of only a head count of the children. No checklist with the children's names was present on the bus. Established procedures [which were formulated by Dye's superiors] did not require identifying each child on the bus by name nor did they require checking each child on and off the bus. These procedures were clearly inadequate, as is evidenced by this case, and they have since been changed to better account for the children. [The changes were suggested and drafted by Dye and approved by the YMCA management].
 "The children and counselors arrived at the skating rink and skated for approximately two hours. Other non-YMCA children were also at the skating rink that day. Ms. Headrick made the decision to return to the YMCA and announcements were made [over the skating rink public-address system] for all of the YMCA children to clear the skating rink, return their skates and line up by the doors. Ms. Headrick, Mr. Dye and the counselors gathered the children, checked the skating rink floor for YMCA stragglers and boarded the children on the buses.
 "Ms. Headrick counted the children on her bus and determined that she had the correct number of children on her bus. Mr. Dye counted the children on his bus and determined that he had one less child than he had arrived with. Mr. Dye, Ms. Headrick and several counselors then returned to the skating rink and searched for a missing child [whose identity was unknown and who could be identified as a YMCA skater only by a yellow wrist bracelet issued by skating rink employees to all the YMCA children]. They did not discover a missing YMCA program child in the rink.
 "Ms. Headrick repeated the head count on her bus and Mr. Dye repeated the head count on his bus. They searched the buses to determine that there was not a child hiding on the bus. They also asked the children on the bus *Page 424 
if they could identify who might be missing from the bus.
 "Mr. Dye then recalled that [Murray], one of the older children, had boarded his bus that morning, left his bus and rode on Ms. Headrick's bus to the skating rink. He thought that he [might have] counted [Murray] as being on his bus going to the skating rink and that this was the explanation for his undercount on the return trip. Ms. Headrick accepted this explanation and the two buses then returned to the YMCA.
 "After returning to the YMCA, the children went inside and were eating a snack. Mr. Timothy Cotton, Jacob and Zack's father, arrived at the YMCA at approximately 4:00 p.m. to pick up his sons. He saw his older son but was unable to find Jacob. He then informed YMCA staff that his son could not be found. The premises of the YMCA were searched and the skating rink was then called to see if Jacob was still there. Jacob was discovered at the skating rink.
 "Mr. Dye and Jacob's father then went to the skating rink. Jacob [who had been unsupervised at the rink for approximately 1½ hours] was unharmed and his father took Jacob home."
Francine Fenderson, a DHR child-abuse-and-neglect investigator, testified at the administrative hearing that when she talked with Rick Madison, the executive director of the Shades Valley YMCA, about the incident, Madison stated that both employees — Dye and Headrick — "knew what they were supposed to do, but they simply did not do it and he felt that they may have been a little relaxed due to the fact that this was a holiday program and not the regular camp program." When, during the administrative hearing, Rick Madison was asked whether he believed that Dye was responsible for the incident, he answered, "We didn't spend a lot of time worrying about who was responsible. We wanted to focus on what to do to keep it from happening again." Madison testified that the YMCA policies and procedures were then changed to "roll call attendance," and Dye was later promoted within the YMCA organization. Madison denied that he had ever told a DHR investigator that Dye and Headrick "knew what they were supposed to do that day but didn't do it." He testified that he did tell DHR that, under the circumstances, "a simple head count was not good enough." He explained:
 "I made that statement because the head count did not work. So it was not because anyone didn't do what they were supposed to do. It was because the system failed, and we needed to make changes so that we could put in place a system that hopefully in the future would not fail."
This court reviews a trial court's judgment regarding the decision of an administrative agency "without any presumption of its correctness, since [the trial] court was in no better position to review the [agency's decision] than" this court.State Health Planning Res. Dev. Admin. v. Rivendell ofAlabama, Inc., 469 So.2d 613, 614 (Ala.Civ.App. 1985). Section41-22-20(k), Ala. Code 1975, a part of the Alabama Administrative Procedure Act ("AAPA"), § 41-22-1 et seq., Ala. Code 1975, governs judicial review of agency decisions. It provides:
 "Except where judicial review is by trial de novo, the agency order shall be taken as prima facie just and reasonable and the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact, except where otherwise authorized by statute. The court may affirm the agency action or remand the case to the *Page 425 
agency for taking additional testimony and evidence or for further proceedings. The court may reverse or modify the decision or grant other appropriate relief from the agency action, equitable or legal, including declaratory relief, if the court finds that the agency action is due to be set aside or modified under standards set forth in appeal or review statutes applicable to that agency or if substantial rights of the petitioner have been prejudiced because the agency action is any one or more of the following:
 "(1) In violation of constitutional or statutory provisions;
 "(2) In excess of the statutory authority of the agency;
"(3) In violation of any pertinent agency rule;
"(4) Made upon unlawful procedure;
"(5) Affected by other error of law;
 "(6) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 "(7) Unreasonable, arbitrary, or capricious, or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion."
If the decision of the ALJ prejudiced the substantial rights of Dye for one of the reasons enumerated in § 41-22-20(k), then the circuit court's judgment is due to be affirmed; if it did not, then the ALJ's determination is due to be upheld and the circuit court's judgment reversed.
On appeal, DHR argues that the circuit court erroneously substituted its judgment for that of the administrative hearing officer when it determined that Dye's conduct did not amount to "indicated" child neglect. We disagree. Section 41-22-20(k) states, in pertinent part, that a court "shall not substitute its judgment for that of the agency as to the weight of the evidenceon questions of fact." (Emphasis added.) That section does not state that a court may not substitute its judgment for that of the agency on a question of law, and that, we conclude, is what the circuit court did in this case.
The material facts in this case were undisputed. Although we have not quoted the circuit court's judgment, which also included findings of fact, the circuit court's findings were, in all material respects, the same as the ALJ's findings. The circuit court did not substitute its judgment for that of the administrative hearing officer on any questions of fact. Instead, the circuit court held that the ALJ's determination (that the undisputed facts amounted to child neglect) was, as a matter of law, "unreasonable, arbitrary, or capricious."
We are in accord with the circuit court's holding that the ALJ's determination was "unreasonable, arbitrary, or capricious" for two reasons. First, the ALJ explicitly found that the policies and procedures of the YMCA were inadequate to prevent
the occurrence that gave rise to these proceedings.
 "At the time of the incident in question, the procedure in place at the YMCA program for checking children on and off the bus consisted of only a head count of the children. No checklist with the children's names was present on the bus. Established procedures did not require identifying each child on the bus by name nor did they require checking each child on and off the bus. These procedures were clearly inadequate, as is evidenced by this case. . . ."
The evidence was undisputed that Dye neither formulated the YMCA "head-count" procedure nor had the authority to change it on December 27, 2000. The evidence was also undisputed that there was no YMCA procedure with respect to "inconsistent head-counts." The record before us demonstrates that, while DHR *Page 426 
has the authority to cite individuals for child neglect, it had no authority to cite the YMCA, as an entity, for child neglect.
In Prometheus Radio Project v. FCC, 373 F.3d 372 (3d Cir. 2004), the United States Court of Appeals for the Third Circuit, in construing 5 U.S.C. § 706, the judicial-review provision of the federal Administrative Procedure Act, upon which the AAPA is modeled, explained a court's review of agency action under the "arbitrary and capricious" standard:
 "The scope of review under the `arbitrary and capricious' standard is `narrow, and a court is not to substitute its judgment for that of the agency.' Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). . . . Nevertheless, we must ensure that, in reaching its decision, the agency examined the relevant data and articulated a satisfactory explanation for its action, including a `rational connection between the facts found and the choice made.' Id. (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). Normally, we may find an agency [action] is arbitrary and capricious where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given. Id. (citing SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)); see also Robert Wood Johnson Univ. Hosp. v. Thompson, 297 F.3d 273, 280 (3d Cir. 2002). Put another way, we reverse an agency's decision when it `is not supported by substantial evidence, or the agency has made a clear error in judgment.' ATT Corp. v. FCC, 220 F.3d 607, 616 (D.C. Cir. 2000) (citing Kisser v. Cisneros, 14 F.3d 615, 619 (D.C. Cir. 1994)).
". . . .
 "Finally, the traditional APA standard of review is even more deferential `where the issues involve "elusive" and "not easily defined" areas. . . .' Sinclair [Broad. Group, Inc. v. FCC], 284 F.3d [148] at 159 [(D.C. Cir. 2002)]. Yet even when an administrative order involves policy determinations on such elusive goals, a `rationality' standard is appropriate. See [FCC v. Nat'l Citizens Comm. for Broad.], 436 U.S. [775] at 796-97, 98 S.Ct. 2096
[(1978)] (finding that the Commission acted rationally in determining that diversification of ownership would enhance the possibility of increasing diverse viewpoints). Additionally, when an agency has engaged in line-drawing determinations and our review is necessarily deferential to agency expertise, see AT T Corp. [v. FCC], 220 F.3d [607] at 627 [(D.C. Cir. 2000)], its decisions may not be `patently unreasonable' or run counter to the evidence before the agency. Sinclair, 284 F.3d at 162."
373 F.3d at 389-90. See generally King v. City of Birmingham,885 So.2d 802 (Ala.Civ.App. 2004) (holding that denial of a liquor license to applicants based upon speculation that applicants might operate their lounge in the same manner as the prior unrelated licensees had done was arbitrary and capricious). The circuit court could properly have determined that the ALJ's decision was unreasonable, arbitrary, or capricious if the court concluded that DHR was inclined to assign responsibility *Page 427 
to someone for the incident of December 27, 2000, and, being without authority to sanction the entity that was accountable,held accountable an individual whom it did have the authority to sanction.
We are in accord with the circuit court's holding that the ALJ's determination was unreasonable, arbitrary, or capricious for a second reason: the different treatment of Headrick and Dye, without legally sufficient reasons for the difference.
 "`"In legal usage, a decision is capricious if it is so unreasonable as to `shock the sense of justice and indicate lack of fair and careful consideration.'
 "`"Typical of the cases in which the epithet capricious may properly be applied are those where an agency has given different treatment to two respondents in identical circumstances, or has exhibited an irrational unfairness which suggests malice or discrimination." 2 Cooper, State Administrative Law (1965), p. 761.'"
Westring v. James, 71 Wis.2d 462, 476-77, 238 N.W.2d 695,702-03 (1976) (quoting Scharping v. Johnson, 32 Wis.2d 383,390, 145 N.W.2d 691, 695 (1966)). See also ANR Pipeline Co. v.FERC, 71 F.3d 897, 901 (D.C. Cir. 1995) (stating that where an agency treats similar situations differently without a reasoned explanation, its decision will be vacated as arbitrary and capricious).
In Bracco Diagnostics, Inc. v. Shalala, 963 F.Supp. 20
(D.D.C. 1997), the manufacturers of contrast imaging agents for use with ultrasound equipment in the diagnosis of cardiac dysfunction challenged a decision by the Food and Drug Administration ("FDA") to treat the manufacturers' agents as "new drugs" while it treated a similar product made by a competitor as a "device." Concluding that the distinction made by the FDA was arbitrary and capricious, the district court for the District of Columbia granted the manufacturers' request for a preliminary injunction. The court stated:
 "Our court of appeals has repeatedly held that `an agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so.' `Government is at its most arbitrary when it treats similarly situated people differently.' . . . `If an agency treats similarly situated parties differently, its action is arbitrary and capricious in violation of the [Administrative Procedure Act].'
 "In this case, the [manufacturers'] and [competitor's] products are identical in all material respects, and the FDA has not provided a legitimate reason for failing to regulate these similar products in the same way. Under the Administrative Procedure Act, the FDA either must provide a rational basis for treating [one] imaging agent as a device while simultaneously regulating essentially identical agents as drugs, or it must treat all four of these similar products in the same way. A failure to do one of these two things is arbitrary and capricious agency action and therefore is a violation of the [Administrative Procedure Act], 5 U.S.C. § 706(2)(A)."
963 F.Supp. at 27-28 (citations omitted).
In the present case, the circuit court's judgment concluded that the ALJ's decision was "unreasonable, arbitrary and capricious in failing to place responsibility on the inadequate YMCA policies and/or Melissa Headrick." We cannot disagree, and we therefore affirm the circuit court's judgment. Our resolution of this issue makes it unnecessary to consider whether the circuit court was correct in reversing the ALJ's decision to prohibit Dye from attending Headrick's hearing.
AFFIRMED. *Page 428 
THOMPSON, PITTMAN, and BRYAN, JJ., concur.
MURDOCK, J., concurs in the result, without opinion.