962 So.2d 805 (2006)
BOARD OF SCHOOL COMMISSIONERS OF MOBILE COUNTY
v.
Marion DUNN.
2040708.
Court of Civil Appeals of Alabama.
June 16, 2006.
*806 Frank G. Taylor and Carvine L. Adams of The Atchison Firm, P.C., Mobile, for appellant.
Gregory B. Stein of Stein, Brewster & Pilcher, L.L.C., Mobile; and Sam Heldman of Gardner, Middlebrooks, Gibbons, Kitrell, Olsen, Walker & Hill, P.C., Washington, D.C., for appellee.
PER CURIAM.
The Board of School Commissioners of Mobile County ("the Board") appeals the decision of a hearing officer that reinstated Marion Dunn, a tenured teacher, after Dunn's employment was terminated by the Board. This is the first case for which this court has granted review pursuant to the 2004 amendments to the Teacher Tenure Act, § 16-24-1 et seq., Ala.Code 1975. See Act No. 2004-566, Ala. Acts 2004; see also § 16-24-10, Ala.Code 1975.
On December 21, 2004, Harold Dodge, the superintendent of the Mobile County Public School System, recommended to the Board that it terminate, pursuant to § 16-24-8, Ala.Code 1975, the employment of Dunn, a science teacher and the head varsity basketball coach at B.C. Rain High School in Mobile, based on Dunn's "failure to perform [his] duties in a satisfactory manner and other good and just cause." The superintendent informed Dunn of the following specific grounds for the proposed termination:
"1. Your performance in administering the basketball program has been unsatisfactory.
"2. You have failed to properly supervise your players during practice.
"3. You have allowed your players to strike, hit and kick other players as a form of discipline.
"4. You have failed to follow proper disciplinary procedures.
"5. You have placed the players under your supervision at risk of physical harm."
The Board upheld the superintendent's recommendation, and Dunn filed a notice of contest of the Board's action pursuant to § 16-24-9(b), Ala.Code 1975. The parties selected, pursuant to § 16-24-20(b), Ala.Code 1975, an experienced employment-law arbitrator as the hearing officer.
At the hearing on April 7, 2005, the evidence established that before the start of the 2004-2005 basketball season, Dunn, acting as the head coach of the varsity basketball team, agreed, at the request of two of his players, to institute a form of team discipline known as the "one-minute drill" or "circle" during basketball practice. Pursuant to that form of team discipline, when the team thought that one of its members needed to be disciplined for violating a team rule or for not performing up to capacity, the team members would encircle the player to be disciplined and hit or kick that player in the center of the circle for 15, 30, or 60 seconds, depending on the offense, while Dunn stood by and timed the punishment with a stopwatch. The record indicates that Dunn decided *807 the length of time of the circle drill. Although Dunn established certain ground rules for the circle drill by prohibiting, for example, blows to the head, the evidence indicated that the players themselves determined whether and to what extent discipline was warranted for a teammate. The evidence tended to show that, during the 6-week period before the start of the 2004-2005 basketball season, the circle drill was used on 11 occasions.
D.W., a sophomore on the basketball team, testified that he had been subjected to the circle drill on two occasions. According to D.W., if a player decided not to participate in the circle drill they "would probably have to get off the team." D.W. testified that, on one occasion, Dunn told him to fight another player, J.Y., after D.W. was late to practice. As a result of that fight, D.W. broke his hand.
On November 6, 2004, about one week before the first home basketball game, K.A., a 16-year-old member of the basketball team, was subjected to the circle drill twice during a team practice session, the first time for being late to practice and the second time for not trying his best during a defensive drill. Dunn directed members of the team to "give [K.A.] a minute" in the circle after K.A. was late to practice. Approximately 30 minutes later, K.A.'s teammates decided to subject K.A. to another circle drill against the wishes of Dunn. Dunn testified that he did not believe K.A. deserved the second circle drill.
K.A. described having been "stomped, kicked and punched" inside the circle, after which, he said, he announced that he was quitting the team and he left the practice court. As a result of being subjected to the circle drill, K.A. suffered scratches and bruises to his ribs, legs, and back. K.A. complained to his aunt, a school nurse at another public school, of being bruised and sore, and he told her that he was "tired of getting beat." K.A.'s aunt observed bruises, welts, and scratches on K.A.'s back and right arm. K.A.'s aunt went to the school and talked to Dunn, as well as the school principal and the school's resource officer. The resource officer subsequently interviewed Dunn and all of the players on the team.
Dunn later met with the school principal and two county education officials  the executive director of high schools and the assistant superintendent for human resources. During that meeting, Dunn acknowledged that he had made a mistake in using the circle drill as a form of discipline and promised that it would not happen again. The executive director of high schools wished Dunn a successful season, and Dunn assumed the matter was closed. Later that night, however, the principal telephoned Dunn and informed him that the news media had learned of the incident with K.A. and that he was placing Dunn on administrative leave.
At the hearing before the hearing officer, a number of the players testified. Without exception, the players praised Dunn, stating that he had been a positive influence in the lives of his students and players, and opining that Dunn's use of the circle drill did not warrant ending his career as a teacher and a coach. The players stated that Dunn had made schoolwork a priority over basketball by encouraging good study habits, requiring them to submit academic progress reports from all their teachers, arranging for tutoring and study sessions, and stressing that they should avoid the use of drugs and plan for college.
Many of the players' parents, relatives, and guardians also testified. All stated that they had been unaware of Dunn's use of the circle drill until it was made public by the news media, and all stated that they opposed that form of discipline. With the *808 exception of K.A.'s aunt, all the adults who testified stated that Dunn's employment should not be terminated because of his use of the circle drill. Most of the parents related incidents indicating that Dunn had been a role model, a mentor, and even a father figure for their sons. They testified that Dunn had helped their sons improve their grades, their attitudes, their personal appearance, and their spiritual lives. Several parents reported that Dunn had invited team members to his home, to church, and to Sunday dinner.
Dr. Tod Childs, the senior guidance counselor at the high school, testified that the basketball players looked to Dunn as a surrogate father who enforced the school dress code, encouraged them to study, and took them to church. Childs testified that he did not agree with Dunn's actions. According to Childs, Dunn's career as an educator would be over if his employment were terminated.
At the time of the hearing, Dunn had taught for at least 20 years and had coached basketball for 13 years. Dunn has both a bachelor's and a master's degree in biology. His past performance evaluations have been in the top two categories. Dunn testified that he knew that using the circle drill as a form of discipline was wrong but that he allowed the circle drill to continue anyway. Dunn explained that the positive benefit brought by the players' participation in the circle drill overshadowed the knowledge that implementing the circle drill was wrong. Dunn concluded his testimony by assuring the hearing officer that a lapse in judgment like that would not reoccur.
On April 30, 2005, the hearing officer rendered a decision in which he revoked the cancellation of Dunn's employment contract as a teacher, imposed upon Dunn a 30-day suspension without pay, ordered that Dunn be barred from any coaching position for a period of 4 years, and required that Dunn apologize to his players and their families. The Board appealed the decision of the hearing officer to this court pursuant to § 16-24-10(b), Ala.Code 1975.
Section 16-24-10(b), Ala.Code 1975, provides that "[t]he decision of the hearing officer shall be affirmed on appeal unless the Court of Civil Appeals finds the decision arbitrary and capricious, in which case the court may order that the parties conduct another hearing consistent with the procedures of this article." The statute mandates an extremely deferential standard of review for a hearing officer's decision in a teacher-tenure case. "`The scope of review under the "arbitrary and capricious" standard is "narrow, and a court is not to substitute its judgment for that of the [tribunal whose decision is being reviewed]."'" Alabama Dep't of Human Res. v. Dye, 921 So.2d 421, 426 (Ala.Civ.App.2005)(quoting Prometheus Radio Project v. FCC, 373 F.3d 372, 389 (3d Cir.2004)(quoting in turn Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983))).
We discern that the legislature established the extremely deferential standard of review set out in § 16-24-10(b) as one of a number of measures designed to further the legislative purpose stated in the title to the act amending the Teacher Tenure Act, namely: "to streamline the contest and appeal processes for teachers." See Act No. 2004-566, Ala. Acts 2004. In amending the Teacher Tenure Act, the legislature specifically authorized de novo review of Board decisions by a hearing officer, see 16-24-10(a), Ala.Code 1975, who is "experienced in employment law," *809 see § 16-24-20(b),[1] who is empowered to modify, mitigate, or nullify the Board action, see § 16-24-16(a), Ala.Code 1975,[2] and whose decision is subject to very limited appellate review, see § 16-24-10(b).[3]
The 2004 amendments to the Teacher Tenure Act indicate that the legislature determined that the contest and appeal procedure for teacher terminations would be streamlined if it empowered experienced employment-law arbitrators to act as hearing officers to review contested terminations; if, in recognition of the expertise of those hearing officers, it gave them broad decision-making authority over teacher terminations; and if it insulated the decisions of those hearing officers from appellate review except in the most "special and important" cases. See § 16-24-10(b).
In granting review in this case, we recognize the legislature's purpose in enacting the 2004 amendments to the Teacher Tenure Act, and we also recognize that that purpose should be effectuated. Accordingly, in all but the most egregious cases, we will defer to a hearing officer's decision. The fact that reasonable people could differ as to the wisdom of a hearing officer's decision invariably means that the decision is not arbitrary. Cf. Pollard v. Unus Props., LLC, 902 So.2d 18, 25 (Ala. 2004) (holding that a city council's zoning decision was not arbitrary and capricious when reasonable persons could disagree as to whether the city council made a wise or correct decision).
The term "arbitrary" has been defined as
"[i]n an unreasonable manner, as fixed or done capriciously or at pleasure. Without adequate determining principle; not founded in the nature of things; nonrational. . . . Without fair, solid, and substantial cause; that is, without cause based upon the law; not governed by any fixed rules or standard. Willful and unreasoning action, without consideration and regard for facts and circumstances presented. Ordinarily, `arbitrary' is synonymous with bad faith or failure to exercise honest judgment and an arbitrary act would be one performed without adequate determination of principle and one not founded in the nature of things."
Black's Law Dictionary 104-05 (6th ed.1990) (citations omitted).
*810 If the decision-maker has "`examined the relevant data and articulated a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made,"'" its decision is not arbitrary. See Alabama Dep't of Human Res. v. Dye, 921 So.2d at 426 (quoting Prometheus Radio Project v. FCC, 373 F.3d at 389 (quoting in turn Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962))).
The Board contends on appeal that the hearing officer's decision was arbitrary and capricious. The Board lists in its brief to this court a number of reasons in support of its contention, some of which are not relevant to the disposition of this appeal. However, we find the Board's contention that the hearing officer's decision was arbitrary and capricious based on the inconsistencies between the hearing officer's conclusions and findings in light of the evidence presented to be dispositive of this appeal.
In his April 30, 2005, decision, the hearing officer concluded, in pertinent part, as follows:
"Coach Dunn's conduct was wrong. It was very wrong. In trying to gain their respect and confidence, permitting [the players] to `do something extra' as they wanted, in an effort to discipline themselves, he went far over the line. Athletes may be in need of discipline and seek ways from their coaches to impose it on them, but this coach made beatings acceptable at this high school and called it discipline.
"Coach Dunn allowed his players to dictate who would be punished and why they should be punished. . . . By agreeing to their way, he not only relinquished control of his team, but more critically, he sent wrong messages  it was acceptable at school to impose this barbaric ritual; beatings could be acceptable rather than criminal; players could make decisions on what should be right and wrong; [and that] society could be manipulated to accept this warped notion of discipline. There are so many wrong messages that Coach Dunn's lack of judgment as a reliable basketball coach, his capabilities as an adult with responsibility to instill good judgment and morals in young men in athletics and his sense of decency must be seriously questioned.
"In their own world of basketball, it is clear that many of these players believed they were doing nothing wrong, especially with the blessing of their head coach. Dunn did not seem to have any misgivings. He did not stop them from beating [K.A.], even though he disagreed with their decision that he deserved punishment. His caving into his players' . . . instincts, rather than instilling decent and sensible values as a basketball coach, is indefensible.
"Just as reprehensible is his behavior when [J.L.], his star player, came to him and complained about the punishment being wrong, the only player to do so. Dunn told him he had to keep doing this ritual because they did it in college. Yet, never before had Dunn justified it based on it being accepted at colleges. The absurdity of colleges permitting beatings of players is beyond comprehension to most people. But to an impressionable young man, who has the potential to use his considerable basketball skills for college scholarships, Coach Dunn's words had meaning. [J.L.] and the rest of the team simply trusted his misguided judgment. Using this seemingly false statement to instill some sort of fear in [J.L.], to keep him in line with street justice at practice, to resort to colleges as a reason for the circle, and to *811 exploit [J.L.'s] desire to play in college, further proves that Dunn lacks the basic capabilities to responsibly lead young men.
"Mind boggling, too, is Dunn's effort at this hearing to somehow downplay the seriousness of his misconduct. First, he contends that the punishment circle only happened occasionally, and merely four or five players were subjected to it in a short six-week period. Factually he is incorrect  on at least 11 occasions, more than twice the number he claimed, players were beaten in the circle. . . . Even if it only happened once, or as he said, five times, it was enough to risk serious physical injury to players he was duty bound to protect from such injury. His telling players to avoid hitting in the head and face ignored completely that blows to vital organs, the neck and throat, and other vulnerable areas of their defenseless bodies could have resulted in severe injuries and even fatalities. Coaching athletics carries with it a clear responsibility to make certain that the players' health and welfare is protected at all times. Parents place their utmost trust in coaches to do just that; coaches have in a sense a fiduciary responsibility to keep this trust or at least a strong moral responsibility to do so.
"The testimony from his own players, as well as his admissions at this hearing, unquestionably establish that on these many occasions he chose not to protect them. And these are not isolated instances as he claims. Testifying that at worst it happened only once a week, is a weak effort to somehow cover-up what instead was a six-week-long parade of innocent players being trampled while he stood by and timed these cruel beatings.
". . . .
"Dunn also contends that the punishment was about to end; he never intended for it to continue once the season started on November 13. The problem is that there is simply no assurance that but for the intervention of [K.A.'s] aunt on November 8, Dunn would have stopped this punishment. . . . This punishment by beating was not about to end.
"And when [K.A.'s aunt] then confronted Dunn, he never stated it would stop. Instead, he simply informed [K.A.'s] aunt that he understood her concern and nothing else. He failed to apologize to her and failed to show any concern about [K.A.'s] physical state after these two beatings he witnessed and approved. . . .
"The notion that discipline in sports can go so far as allowing for players to be hit and kicked as a means to punish them cannot be acceptable. . . . There are well-publicized cases of coaching icons that have lost their jobs over temper-tantrums that resulted in bouts with players, or more recently a well-known basketball coach with many years college experience who was indefinitely suspended by his school from coaching for sending his player on the court to intentionally harm an opposing player. There is enough violence in the streets already without coaching role models adopting those tactics for discipline at school-sponsored athletics."
In his decision, the hearing officer went on to consider Dunn's employment history as a teacher, stating:
"At first blush there seems little need to consider the rest of [Dunn's] history inasmuch as his misconduct is so outrageous. On the other hand, it would be a huge oversight to then ignore his spotless employment record and other evidence presented at this hearing. There *812 is no record of any discipline. His performance evaluations, at least the few made available in this hearing, show him in one of the top two rated categories for these years. There are no evaluations for the last two years.
"There is also the testimony of every witness, with the exception of [K.A.'s] aunt, who wants Dunn to remain as a teacher and coach . . ., as well as the absence of any witnesses from the school's administration. Moreover, virtually all of those who testified detailed many positive attributes about his character and his ability to positively influence students and his players.
". . . .
"There is much good to also consider in weighing the proper action. In sorting out these fine attributes, it is clear that Dunn always had the best educational interests of his students at heart and took many positive steps on their behalf. These are valuable assets; to strip them away from this inner city school, which may have few assets, can hurt more than help it. This record contains no evidence that Dunn lacks the qualities needed of a good and sound teacher.
"But the same cannot be said as a basketball coach. His naivety, insensitivity, lack of contriteness and overall horrendous judgment by allowing his players to institute . . . justice and bring it into the school cannot in any form be tolerated. It is imperative that a loud and clear signal be sent not just to Dunn, but also to the high-school community and in a broader sense the Mobile community  the children in its schools cannot be subjected to cruel treatment that is approved by one of its coaches."
As previously stated, the hearing officer revoked the cancellation of Dunn's employment contract as a teacher, imposed upon Dunn a 30-day suspension without pay, ordered that Dunn be barred from any coaching position for a period of 4 years, and required Dunn to issue an apology to his players and their families.
Although this court recognizes the narrow scope of review applicable in appeals pursuant to § 16-24-10(b), we find that the hearing officer's decision was both arbitrary and capricious. The hearing officer's conclusions regarding Dunn's actions as a basketball coach and his record as a teacher are inconsistent. In his decision, the hearing officer states that Dunn "lacks the basic capabilities to responsibly lead young men" and questions Dunn's "sense of decency" and concludes that there was "no question that the Board ha[d] reasonably and substantially proven that Dunn engaged in serious misconduct. . . ." However, the hearing officer describes Dunn as a "wonderful teacher" and states that "th[e] record contains no evidence that Dunn lacks the qualities needed for a good and sound teacher."
The decision of the hearing officer suggests that Dunn's position as an educator and his position as a basketball coach are somehow separate and distinct from one another. Although members of the community testified that they did not want Dunn to be discharged from his teaching position and his coaching position, no member of the community agreed that the circle drill was an appropriate disciplinary method. The decision to categorize Dunn's actions into those of a teacher versus those of a basketball coach sets a dangerous precedent for those students who play sports under the guidance of a coach who also teaches them in the classroom. Although Dunn at times served as a coach to the basketball team, he was still at all times a teacher.
*813 The hearing officer described Dunn's actions as "wrong," "warped," "ill-conceived," and "indefensible." The evidence supports the hearing officer's description of Dunn's egregious actions. Dunn allowed players to institute the circle drill as a form of discipline. Dunn testified before the hearing officer that he allowed the circle drill to take place even though he "felt a little uncomfortable about it." However, Dunn overlooked his concern because, he testified, the team was making so much progress as the basketball season approached. Dunn acknowledged that the rules of the circle drill allowed the players on the team to punch and kick a fellow player as a form of discipline. Dunn allowed the circle drill to continue even though the players had sustained physical injuries from their participation in the circle drill. Dunn's actions support the hearing officer's conclusion that Dunn showed a "lack of judgment."
The record indicates that Dunn allowed the players to choose when a fellow player would have to submit to a circle drill and that Dunn timed the drill. Dunn was present during the circle drills and observed the players participate in the drills. Dunn explained that he "could not overrule the team" when the team decided whether to make a player submit to a circle drill. Dunn testified that the circle drills ended only after K.A.'s aunt complained to the school.
Based on the hearing officer's findings and conclusions in light of the evidence, we conclude that the hearing officer's decision was arbitrary and capricious. To hold otherwise, as the dissent advocates, would effectively condone the actions of a teacher who allowed a group of students to assault another student while he observed and timed the brutal act; this we cannot do. Surely the legislature would not have provided for an appeal to this court in a teacher-tenure case if its intent was for us to simply rubber stamp the decision of the hearing officer. Accordingly, the decision of the hearing officer is reversed, and the cause is remanded for the parties to conduct another hearing consistent with the procedures of § 16-24-10, Ala.Code 1975.
REVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON and BRYAN, JJ., concur.
PITTMAN and MURDOCK, JJ., concur in the result, without writing.
CRAWLEY, P.J., dissents, with writing.
CRAWLEY, Presiding Judge, dissenting.
The main opinion concludes that the hearing officer's determination to impose a four-year ban on Dunn's coaching but to reinstate Dunn to his teaching position was inconsistent and, therefore, arbitrary. I disagree.
The hearing officer acknowledged the apparent inconsistency in treating the coaching position differently from the teaching position when he stated:
"The Hearing Officer has already expressed his disdain for Coach Dunn's actions. At first blush there seems little need to consider the rest of his history inasmuch as his misconduct is so outrageous. On the other hand, it would be a huge oversight to then ignore [Dunn's] spotless employment record and other evidence presented at this hearing."
The hearing officer then explained in detail the reasons he considered Dunn's unblemished employment history as a teacher separately from Dunn's misconduct as a coach in determining whether to uphold the Board's termination of Dunn's teaching contract. The reasons were cogent, compelling, and supported by the evidence presented at the hearing. Although reasonable *814 people might disagree about the wisdom of the hearing officer's decision to revoke the Board's cancellation of Dunn's teaching contract, it cannot be argued that the decision was supported by facts and reasons, represented a balancing of competing interests, and was authorized by Alabama law. The hearing officer summarized his decisional process:
"Alabama law allows the hearing officer sufficient discretion to fashion a remedy of `actions' tailored to the decision. In deciding these actions, the Hearing Officer has attempted to balance a number of vital concerns: making certain that Coach Dunn fully understands the seriousness and severity of his conduct, assuring the school and the community that it will never happen again, and at the same time preserving some of the good in Coach Dunn without permanently damaging him and others."
The main opinion recites the appropriate principles underlying our very deferential standard of review in Teacher Tenure Act cases. The main opinion's reversal of the hearing officer's decision, however, demonstrates that its recitation of those principles is mere lip service. By substituting its judgment for that of the hearing officer in a case in which reasonable people could differ as to the wisdom of the decision, the main opinion is engaging in judicial activism and usurpation of the legislative function. For these reasons, I dissent.
NOTES
[1] Section 16-24-20(b) provides:

"If a teacher should timely file a contest from a decision as provided in this article, the employing board and the teacher shall, within seven days of such filing, either (1) mutually agree upon a person to hear the teacher's contest, or (2) submit a joint request for a panel of arbitrators to the Federal Mediation and Conciliation Services' Office of Arbitration Services (FMCS). The joint request shall specify that the parties prefer a hearing officer who is experienced in employment law."
[2] Section 16-24-10(a) provides that "[t]he hearing officer shall determine which of the following actions should be taken relative to the employee: Cancellation of the employment contract, a suspension of the employee, with or without pay, a reprimand, other disciplinary action, or no action against the employee."
[3] Section 16-24-10(b) provides, in pertinent part:

"All appeals of a final decision of the hearing officer shall lie with the Court of Civil Appeals. . . . The Court of Civil Appeals shall have discretion to refuse to hear appeals of final decisions of a hearing officer pursuant to this article. Review by the Court of Civil Appeals pursuant to this article is not a matter of right, but of judicial discretion, and an appeal may be granted only when the court determines there are special and important reasons for granting the appeal."