WOODALL, Justice.
This case arises under the Teacher Tenure Act, § 16-24-1 et seq., Ala.Code 1975 (“the Act”). We reverse the judgment of the Court of Civil Appeals.
Section 16-24-8 provides the grounds for the cancellation of the employment contract of a tenured teacher:
“Cancellation of an employment contract with a teacher on continuing service status may be made for incompetency, insubordination, neglect of duty, immorality, failure to perform duties in a satisfactory manner, justifiable decrease in the number of teaching positions or other good and just cause, but cancellation may not be made for political or personal reasons.”
On December 21, 2004, the superintendent of the Mobile County Public School System recommended to the Board of School Commissioners of Mobile County (“the Board”) that it terminate the employment of Marion Dunn, a tenured science teacher and the head varsity basketball coach at B.C. Rain High School in Mobile, based upon Dunn’s alleged “failure to perform [his] duties in a satisfactory manner and other good and just cause.” The proposed termination resulted from Dunn’s institution of a physically abusive form of team discipline during basketball practice.
The Board voted to terminate Dunn’s employment, and Dunn filed with the superintendent a written notice of contest of the Board’s action, as allowed by § 16-24-9(b). Pursuant to § 16-24-20(b), the parties selected an experienced employment-law arbitrator as the hearing officer.
The responsibilities of the hearing officer are found in § 16-24-10(a):
“The hearing officer shall conduct a de novo hearing and shall render a decision based on the evidence and/or information submitted to the hearing officer. The hearing officer shall determine which of the following actions should be taken relative to the employee: Cancellation of the employment contract, a suspension of the employee, with or without pay, a reprimand, other disciplinary action, or no action against the employee. The hearing officer shall render a written decision, with findings of fact and conclusions of law, within 30 days after its hearing.”
An ore tenus hearing was held on April 7, 2005. On April 30, 2005, the hearing officer rendered his written decision. The hearing officer found beyond question “that the Board ha[d] reasonably and substantially proven that Dunn engaged in serious misconduct, as set forth in the five *816 charges[1] made in the superintendent’s recommendations to the Board.” However, the hearing officer did not cancel Dunn’s employment contract. Instead, he ordered that Dunn be barred from any coaching position for four years, that he be suspended without pay for 30 days, and that he apologize to his players orally and to each of their parents or guardians in writing. Dunn’s employment as a science teacher was not terminated.
The Board appealed the decision of the hearing officer to the Court of Civil Appeals. The Court of Civil Appeals, exercising the discretion given to it by § 16-24 — 10(b), agreed to hear the appeal. After reviewing the record before the hearing officer and the briefs of the parties, the Court of Civil Appeals, in a plurality opinion issued per curiam, found the hearing officer’s decision arbitrary and capricious, reversed that order, and, as allowed by § 16 — 24—10(b), remanded the case for the parties to conduct another hearing consistent with the procedures set forth in the Act. Board of Sch. Comm’rs of Mobile County v. Dunn, 962 So.2d 805 (Ala.Civ.App.2006).
Dunn petitioned this Court for certiorari review. We granted his petition to determine whether the Court of Civil Appeals erred in concluding that the hearing officer’s decision was arbitrary and capricious. See Rule 39(k), Ala. R.App. P. (“The scope of review includes the application of the law to the stated facts.”).
The Act provides, in pertinent part, that “[t]he decision of the hearing officer shall be affirmed on appeal unless the Court of Civil Appeals finds the decision arbitrary and capricious .... ” § 16-24-10(b)(emphasis added). “ ‘On certiorari review, this Court accords no presumption of correctness to the legal conclusions of the intermediate appellate court. Therefore, we must apply de novo the standard of review that was applicable in the Court of Civil Appeals.’ ” Ex parte Helms, 873 So.2d 1139, 1143 (Ala.2003)(quoting Ex parte Toyota Motor Corp., 684 So.2d 132, 135 (Ala.1996)).
The plurality decision of the Court of Civil Appeals properly acknowledges that the Act gives hearing officers “broad decision-making authority over teacher terminations.” Dunn, 962 So.2d at 809. Consequently, their decisions are “subject to very limited appellate review.” 962 So.2d at 809. Indeed, by the explicit terms of the Act, the decision of a hearing officer must be affirmed on appeal unless the decision is found to be arbitrary and capricious.
The plurality opinion of the Court of Civil Appeals correctly states that the arbitrary-and-capricious standard of review is “extremely deferential,” Dunn, 962 So.2d at 808, and that the reviewing court may not substitute its judgment for that of the hearing officer. That opinion also aptly states that where “reasonable people could differ as to the wisdom of a hearing officer’s decision!,] ... the decision is not arbitrary.” Dunn, 962 So.2d at 809. Additionally, we find no fault with the following statement in that opinion:
“If the decision-maker has ‘ “examined the relevant data and articulated a satisfactory explanation for its action, including a ‘rational connection between the *817 facts found and the choice made,’ ” ’ its decision is not arbitrary. See Alabama Dep’t of Human Res. v. Dye, 921 So.2d [421, 426 (Ala.Civ.App.2005) (quoting Prometheus Radio Project v. FCC, 373 F.3d [372, 389 (3d Cir.2004) ](quoting in turn Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962))).”
Dunn, 962 So.2d at 810. We must honor these principles in conducting our review.
As previously mentioned, the proceedings to terminate Dunn’s employment followed his institution of a physically abusive form of team discipline during basketball practice. The substance of the testimony concerning Dunn’s wrongdoing is described at length in the opinion of the Court of Civil Appeals:
“At the hearing on April 7, 2005, the evidence established that before the start of the 2004-2005 basketball season, Dunn, acting as the head coach of the varsity basketball team, agreed, at the request of two of his players, to institute a form of team discipline known as the ‘one-minute drill’ or ‘circle’ during basketball practice. Pursuant to that form of team discipline, when the team thought that one of its members needed to be disciplined for violating a team rule or for not performing up to capacity, the team members would encircle the player to be disciplined and hit or kick that player in the center of the circle for 15, 30, or 60 seconds, depending on the offense, while Dunn stood by and timed the punishment with a stopwatch. The record indicates that Dunn decided the length of time of the circle drill. Although Dunn established certain ground rules for the circle drill by prohibiting, for example, blows to the head, the evidence indicated that the players themselves determined whether and to what extent discipline was warranted for a teammate. The evidence tended to show that, during the 6-week period before the start of the 2004-2005 basketball season, the circle drill was used on 11 occasions.
“D.W., a sophomore on the basketball team, testified that he had been subjected to the circle drill on two occasions. According to D.W., if a player decided not to participate in the circle drill they ‘would probably have to get off the team.’ D.W. testified that, on one occasion, Dunn told him to fight another player, J.Y., after D.W. was late to practice. As a result of that fight, D.W. broke his hand.
“On November 6, 2004, about one week before the first home basketball game, K.A., a 16-year-old member of the basketball team, was subjected to the circle drill twice during a team practice session, the first time for being late to practice and the second time for not trying his best during a defensive drill. Dunn directed members of the team to ‘give [K.A.] a minute’ in the circle after K.A. was late to practice. Approximately 30 minutes later, K.A.’s teammates decided to subject K.A. to another circle drill against the wishes of Dunn. Dunn testified that he did not believe K.A. deserved the second circle drill.
“K.A. described having been ‘stomped, kicked and punched’ inside the circle, after which, he said, he announced that he was quitting the team and he left the practice court. As a result of being subjected to the circle drill, K.A. suffered scratches and bruises to his ribs, legs, and back. K.A. complained to his aunt, a school nurse at another public school, of being bruised and sore, and he told her that he was ‘tired of getting beat.’ K.A.’s aunt observed bruises, welts, and scratches on K.A.’s back and right arm. K.A.’s aunt went to the *818 school and talked to Dunn, as well as the school principal, and the school’s resource officer. The resource officer subsequently interviewed Dunn and all of the players on the team.
“Dunn later met with the school principal and two county education officials — the executive director of high schools and the assistant superintendent for human resources. During that meeting, Dunn acknowledged that he had made a mistake in using the circle drill as a form of discipline and promised that it would not happen again. The executive director of high schools wished Dunn a successful season, and Dunn assumed the matter was closed. Later that night, however, the principal telephoned Dunn and informed him that the news media had learned of the incident with K.A. and that he was placing Dunn on administrative leave.”
Dunn, 962 So.2d at 806-07.
The hearing officer also heard testimony concerning Dunn’s otherwise positive influence as a teacher and coach. The Court of Civil Appeals’ opinion accurately summarizes this testimony:
“At the hearing before the hearing officer, a number of the players testified. Without exception, the players praised Dunn, stating that he had been a positive influence in the lives of his students and players, and opining that Dunn’s use of the circle drill did not warrant ending his career as a teacher and a coach. The players stated that Dunn had made schoolwork a priority over basketball by encouraging good study habits, requiring them to submit academic progress reports from all their teachers, arranging for tutoring and study sessions, and stressing that they should avoid the use of drugs and plan for college.
“Many of the players’ parents, relatives, and guardians also testified. All stated that they had been unaware of Dunn’s use of the circle drill until it was made public by the news media, and all stated that they opposed that form of discipline. With the exception of K.A.’s aunt, all the adults who testified stated that Dunn’s employment should not be terminated because of his use of the circle drill. Most of the parents related incidents indicating that Dunn had been a role model, a mentor, and even a father figure for their sons. They testified that Dunn had helped their sons improve their grades, their attitudes, their personal appearance, and their spiritual lives. Several parents reported that Dunn had invited team members to his home, to church, and to Sunday dinner.
[[Image here]]
“At the time of the hearing, Dunn had taught for at least 20 years and had coached basketball for 13 years. Dunn has both a bachelor’s and a master’s degree in biology. His past performance evaluations have been in the top two categories. Dunn testified that he knew that using the circle drill as a form of discipline was wrong but that he allowed the circle drill to continue anyway. Dunn explained that the positive benefit brought by the players’ participation in the circle drill overshadowed the knowledge that implementing the circle drill was wrong. Dunn concluded his testimony by assuring the hearing officer that a lapse in judgment like that would not reoccur.”
Dunn, 962 So.2d at 807-08.
In his written decision, the hearing officer concluded that Dunn had engaged in reprehensible misconduct, explaining, in pertinent part:
“Coach Dunn’s conduct was wrong. It was very wrong. In trying to gain their respect and confidence, permitting *819 them to ‘do something extra’ as they wanted, in an effort to discipline themselves, he went far over the line. Athletes may be in need of discipline and seek ways from their coaches to impose it on them, but this coach made beatings acceptable at this high school and called it discipline.
“Coach Dunn allowed his players to dictate who would be punished and why they should be punished. By so doing, he gave in to what appears to be the street world of some of his players. There, street justice attempts to prevail over rules of society. By agreeing to their way, he not only relinquished control of his team, but more critically, he sent wrong messages — it was acceptable at school to impose this barbaric ritual; beatings could be acceptable rather than criminal; players could make decisions on what should be right and wrong; society could be manipulated to accept this warped notion of discipline. There are so many wrong messages that Coach Dunn’s lack of judgment as a reliable basketball coach, his capabilities as an adult with responsibility to instill good judgment and morals in young men in athletics, and his sense of decency must be seriously questioned.
“In their own world of basketball, it is clear that many of these players believed they were doing nothing wrong, especially with the blessing of their head coach. Dunn did not seem to have any misgivings. He did not stop them from beating [K.A.], even though he disagreed with their decision that he deserved punishment. His caving into his players’ street instincts, rather than instilling decent and sensible values as a basketball coach, is indefensible.
“Just as reprehensible is his behavior when [J.L.], his star player, came to him and complained about the punishment being wrong, the only player to do so. Dunn told him he had to keep doing this ritual because they did it in college. Yet, never before had Dunn justified it based on it being accepted at colleges. The absurdity of colleges permitting beatings of players is beyond comprehension to most people. But to an impressionable young man, who has the potential to use his considerable basketball skills for college scholarships, Coach Dunn’s words had meaning. [J.L.] and the rest of the team simply trusted his misguided judgment. Using this seemingly false statement to instill some sort of fear in [J.L.], to keep him in line with street justice at practice, to resort to colleges as a reason for the circle, and to exploit [J.L.’s] desire to play in college, further proves that Dunn lacks the basic capabilities to responsibly lead young men.
“Mind boggling, too, is Dunn’s effort at this hearing to somehow downplay the seriousness of his misconduct. First, he contends that the punishment circle only happened occasionally, and merely four or five players were subjected to it in a short six-week period. Factually he is incorrect — on at least 11 occasions, more than twice the number he claimed, players were beaten in the circle, including one time when two players squared off with each other at the direction of Coach Dunn. But the number is mostly irrelevant. Even if it only happened once, or as he said five times, it was enough to risk serious physical injury to players he was duty bound to protect from such injury. His telling players to avoid hitting in the head and face ignored completely that blows to vital organs, the neck and throat, and other vulnerable areas of their defenseless bodies could have resulted in severe injuries and even fatalities. Coaching athletics carries with it a clear responsi *820 bility to make certain that the players’ health and welfare is protected at all times. Parents place their utmost trust in coaches to do just that; coaches have in a sense a fiduciary responsibility to keep this trust or at least a strong moral responsibility to do so.
“The testimony from his own players, as well as his admissions at this hearing, unquestionably establish that on these many occasions he chose not to protect them. And these are not isolated instances as he claims. Testifying that at worst it happened only once a week, is a weak effort to somehow cover-up what instead was a six week long parade of innocent players being trampled while he stood by and timed these cruel beatings.
“Moreover, the contention that no physical harm occurred is misplaced. Serious physical injury occurred when Coach Dunn allowed two players to engage in hand-to-hand combat rather than be victims of the circle. One of the players broke his hand. Also, after [K.A.] wanted to quit the team and Dunn subjected him instead to another beating by the players, he came away with bruises, cuts and scratches and had difficulty walking. Then, there is the unknown mental damage to any number of the players. It would not be a stretch to come to this conclusion considering that each one of them was balled up in the middle of this circle while being kicked and punched repeatedly. Dunn’s insensitivity to all of this ill-conceived behavior cannot be tolerated.
“His second argument that he was ‘blinded’ by the progress of his team, suggests that this progress can be attributed to the beatings. It is a suggestion that Dunn even referenced in his testimony. There must be deep concern with this notion. To even suggest that organized beatings of his players could in any way be related to the progress of his team is outright scary. If a seemingly intelligent young man, with strong religious beliefs, can succumb to this type of ‘blindness’ then there is absolutely a strong and immediate need to send a clear and convincing message to him that he will never forget.
“Dunn also contends that the punishment was about to end; he never intended for it to continue once the season started on November 13. The problem is that there is simply no assurance that but for the intervention of [K.A.’s] aunt on November 8, Dunn would have stopped this punishment. Certainly if Dunn’s assistant is any indicator, it was not about to end at that time. When [K.A.’s aunt] started her confrontation process by first seeking out Dunn’s assistant, he labeled it as mere discipline and then added words that seemed to make little sense, ‘you give it as you get it.’ The only sense that [K.A.’s aunt] could make of it was that she needed to turn Dunn in right away. This punishment by beating was not about to end.
“And when she then confronted Dunn he never stated it would stop. Instead he simply informed [her] that he understood her concern and nothing else. He failed to apologize to her and failed to show any concern about [K.A.’s] physical state after these two beatings he witnessed and approved. Dunn had another opportunity to undo his insensitive response to [K.A.’s aunt] in the presence of the principal and during his interview with the security chief. Still, he showed no compassion for harming his players and offered no words of apology. In this session with the principal and [K.A.’s aunt] he merely explained that her nephew was ‘dogging it,’ which suggested that he was somehow deserving of a beating. To be expected Dunn was *821 contrite at the hearing and for that he is given some credit. But his lack of forgiveness at these critical junctures in November cannot be so easily forgiven when deciding what should be done about his gross misconduct.
“The notion that discipline in sports can go so far as allowing for players to be hit and kicked as a means to punish them cannot be acceptable. When the assistant coach told [K.A.’s] aunt that all her nephew received was ‘discipline’ by the team, he conveyed th& notion, emanating from the head coach, that under the umbrella of discipline, virtually anything goes. There are well-publicized cases of coaching icons that have lost their jobs over temper-tantrums that resulted in bouts with players, or more recently a well-known basketball coach with many years college experience who was indefinitely suspended by his school from coaching for sending his player on the court to intentionally harm an opposing player. There is enough violence in the streets already without coaching role models adopting those tactics for discipline at school-sponsored athletics.”
The hearing officer’s conclusion that Dunn had engaged in the serious misconduct with which he had been charged led the hearing officer to ban Dunn from coaching for 4 years, suspend him without pay for 30 days, and require him to apologize to his players and their parents or guardians. However, the hearing officer chose to allow Dunn to retain his position as a science teacher. In doing so, he explained:
“Dunn contends that the Hearing Officer take into account his entire employment record, including his many positive attributes as recounted at this hearing, and either mitigate the cancellation action or completely restore him to his full employment as teacher and coach under his contract. The Alabama Teacher Tenure Act permits the Hearing Officer to consider more than just the act of misconduct. Section 16 — 24—20(c) provides: ‘During all hearings conducted before a hearing officer pursuant to this article, the hearing officer may consider the employment history of the teacher, including, but not limited to, matters occurring in previous years.’ (Emphasis added.) Although not mandatory, the legislature clearly showed concern that a teacher’s otherwise good record could be considered.
“This type of evidence is of particular relevance under Section 16-24-10, which permits the hearing officer a fair amount of latitude when considering remedy or ‘actions,’ as they are termed in this law, once making findings of fact and conclusions. It provides: ‘The hearing officer shall determine which of the following actions should be taken relative to the employee: Cancellation of the employment contract, a suspension of the employee, with or without pay, a reprimand, other disciplinary action, or no action against the employee.’ (Emphasis added.)
“This case thus comes down to whether cancellation of Coach Dunn’s employment contract and his removal from this school district, which could effectively end his teaching and coaching careers, is the just and proper action in these circumstances. Given this Alabama law, several questions occur when consideration of the remedy is examined. First, whether the hearing officer should take into account Dunn’s employment history, and whether this also includes evidence regarding his role with students and players; if so, whether this evidence is sufficient to mitigate the termination decision. If such mitigation is considered and accepted, the final question is which *822 ‘actions’ or remedies under this Alabama law are best appropriate.
“The Hearing Officer has already expressed his disdain for Coach Dunn’s actions. At first blush there seems little need to consider the rest of his history inasmuch as his misconduct is so outrageous. On the other hand, it would be a huge oversight to then ignore his spotless employment record and other evidence presented at this hearing. There is no record of any discipline. His performance evaluations, at least the few made available in this hearing, show him in one of the top two rated categories for these years. There are no evaluations for the last two years.
“There is also the testimony of every witness, with the exception of [KA.’s] aunt, who wants Dunn to remain as a teacher and coach at Rains, as well as the absence of any witnesses from the school’s administration. Moreover, virtually all of those who testified detailed many positive attributes about his character and his ability to positively influence students and his players. He believed in education first — his emphasis on study groups, tutors, reporting grades to him, instituting a progress report form for teachers, meeting regularly with a guidance counselor, and encouraging college credit courses. He was able to improve grades, in some cases dramatically, and he made college a realistic goal. These are valuable assets in a teacher that are especially significant in a Title I school, where emphasis on bettering the educational process is significant and at times difficult, especially given the problems in finding teachers to stay in these schools. [G.H.]: ‘... he just doesn’t want you to play basketball for him. He wants you to get something out of school, go get a good education. And he keeps the players out of trouble.’
“Parents and guardians, too, recognized his valuable contribution to the school. Testimony by the grandmother of one player is a good example. ‘He is the only positive or major role around there ... he’s the only person I know that ... tries at that school as far as discipline and academics.’ [J.L.’s] aunt and guardian related: ‘We don’t have enough ... in the system like him to help our kids.’
“There is thus much good to also consider in weighing the proper action. In sorting out these fine attributes, it is clear that Dunn had the best educational interests of his students at heart and took many positive steps on their behalf. These are valuable assets; to strip them away from this inner city school, which may have few assets, can hurt more than help it. This record contains no evidence that Dunn lacks the qualities needed of a good and sound teacher.
“But the same cannot be said as a basketball coach. His naivety, insensitivity, lack of contriteness and overall horrendous judgment by allowing his players to institute street justice and bring it into the school cannot in any form be tolerated. It is imperative that a loud and clear signal be sent not just to Dunn, but also the high school community and in a broader sense the Mobile community — the children in its schools cannot ever be subjected to cruel treatment that is approved by one of its coaches. And for these reasons, the actions ordered in the next section of this decision are intended to make it unmistakably known that regardless of whether the local community feels one way, issues of what is right and wrong must prevail.
“Alabama law allows the hearing officer sufficient discretion to fashion a remedy or ‘actions’ tailored to the deci *823 sion. In deciding these actions, the Hearing Officer has attempted to balance a number of vital concerns: Making certain that Coach Dunn fully understands the seriousness and severity of his conduct, assuring the school and the community that it will never happen again, and at the same time preserving some of the good in Coach Dunn without permanently damaging him and others.”
According to the plurality decision of the Court of Civil Appeals, “the hearing officer’s decision was both arbitrary and capricious. The hearing officer’s conclusions regarding Dunn’s actions as a basketball coach and his record as a teacher are inconsistent.” Dunn, 962 So.2d at 812. Presiding Judge Crawley dissented from the court’s decision, stating, in pertinent part:
“The main opinion concludes that the hearing officer’s determination to impose a four-year ban on Dunn’s coaching but to reinstate Dunn to his teaching position was inconsistent and, therefore, arbitrary. I disagree.
“The hearing officer acknowledged the apparent inconsistency in treating the coaching position differently from the teaching position when he stated:
“ ‘The Hearing Officer has already expressed his disdain for Coach Dunn’s actions. At first blush there seems little need to consider the rest of his history inasmuch as his misconduct is so outrageous. On the other hand, it would be a huge oversight to then ignore [Dunn’s] spotless employment record and other evidence presented at this hearing.’
“The hearing officer then explained in detail the reasons he considered Dunn’s unblemished employment history as a teacher separately from Dunn’s misconduct as a coach in determining whether to uphold the Board’s termination of Dunn’s teaching contract. The reasons were cogent, compelling, and supported by the evidence presented at the hearing. Although reasonable people might disagree about the wisdom of the hearing officer’s decision to revoke the Board’s cancellation of Dunn’s teaching contract, it cannot be argued that the decision was supported by facts and reasons, represented a balancing of competing interests, and was authorized by Alabama law. The hearing officer summarized his decisional process:
“ ‘Alabama law allows the hearing officer sufficient discretion to fashion a remedy [or] “actions” tailored to the decision. In deciding these actions, the Hearing Officer has attempted to balance a number of vital concerns: making certain that Coach Dunn fully understands the seriousness and severity of his conduct, assuring the school and the community that it will never happen again, and at the same time preserving some of the good in Coach Dunn without permanently damaging him and others.’ ”
Dunn, 962 So.2d at 813-14 (Crawley, P. J., dissenting). We agree with Presiding Judge Crawley.
Section 16-24-10(a) gives the hearing officer the authority to determine the appropriate disciplinary action. In exercising this authority, “the hearing officer may consider the employment history of the teacher, including, but not limited to, matters occurring in previous years.” § 16 — 24—20(c). In this case, the hearing officer’s decision clearly reflects his careful consideration of Dunn’s entire “employment history,” including the good as well as the indefensible. Only after doing so did the experienced hearing officer determine what he considered to be the appropriate sanction for Dunn’s misconduct. Although we may disagree with the wisdom of the decision, we may not substitute our *824 judgment for that of the hearing officer. In our opinion, the hearing officer’s decision is not arbitrary, because it is clear that he examined all the facts, articulated a satisfactory explanation for his action, and stated a rational connection between the facts and the discipline he imposed.
The Board argues that the “hearing officer ... was arbitrary and capricious in placing too much emphasis on mitigating factors, considering the egregious nature of the misconduct itself.” Board’s brief, at 24. However, it is the hearing officer’s responsibility to weigh the evidence, and this Court may not substitute its judgment for that of the hearing officer. The Act allowed the hearing officer to consider the “mitigating factors” evident in Dunn’s employment history, both as a coach and as a teacher. We will not second-guess his decision.
For the foregoing reasons, we reverse the judgment of the Court of Civil Appeals and remand the case for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
NABERS, C.J., and SEE, LYONS, HARWOOD, SMITH, BOLIN, and PARKER, JJ., concur.

. According to the hearing officer's decision, the superintendent had "recommended that Coach Dunn's contract be cancelled for ... unsatisfactory performance in administering the basketball program; failure to properly supervise his players during practice; allowing his players to 'strike, hit and kick other players as a form of discipline’; failure to follow proper disciplinary procedures; [and] placing players under his supervision ‘at risk of physical harm.' "