64 So.3d 1 (2010)
ATTORNEYS INSURANCE MUTUAL OF ALABAMA, INC.
v.
ALABAMA DEPARTMENT OF INSURANCE.
2081139.
Court of Civil Appeals of Alabama.
October 22, 2010.
*3 Joseph C. Espy III of Melton, Espy & Williams, P.C., Montgomery; and John T. Mooresmith and Jack P. Stephenson, Jr., of Burr & Forman LLP, Birmingham, for appellant.
J. Failey McDonald III, chief counsel, and Ryan Donaldson, assoc. counsel, Alabama Department of Insurance, for appellee.
Harry W.R. Chamberlain II of Buchalter Nemer, P.C., Los Angeles, California; and Larry W. Harper and Keith J. Pflaum of Porterfield, Harper, Mills & Motlow, P.A., Birmingham, for amici curiae Lawyers Mutual Insurance Company of Kentucky, Ohio Bar Liability Insurance Company, Oklahoma Attorneys Mutual Insurance Company, and Texas Lawyers' Insurance Exchange, in support of the appellant.

On Applications for Rehearing
PER CURIAM.
The opinion of August 13, 2010, is withdrawn, and the following is substituted therefor.
This is an appeal of a judgment affirming an administrative decision of the commissioner ("the commissioner") of the Alabama Department of Insurance ("the department").
The record indicates that Attorneys Insurance Mutual of Alabama, Inc. ("AIM"), was created in 1988 and began operating in 1989 as a provider of legal-malpractice insurance for attorneys licensed and practicing in Alabama. The department is required to conduct an examination of an insurer such as AIM every five years; each examination concerns a five-year period of operations of the insurance company being reviewed. See § 27-2-21, Ala. Code 1975. In 2007, the department released its report of the examination (hereinafter "the examination report") for AIM for the period January 1, 2001, through December 31, 2005. AIM filed an objection to several aspects of that report. The parties could not resolve their differences regarding whether to leave in the examination report some of the conclusions reached by the department to which AIM objected. Therefore, AIM requested a hearing before the commissioner. See § 27-2-28, Ala.Code 1975.
The commissioner conducted a hearing at which he received ore tenus evidence and a number of documentary exhibits. In his August 28, 2008, decision, the commissioner found in favor of the department on several issues in dispute, and he resolved some issues in favor of AIM. In pertinent part, the commissioner affirmed the department's *4 determinations that AIM had violated § 27-27-26, Ala.Code 1975, through the arrangement by which AIM compensated an officer and director of the company who provided legal and other services to AIM; that AIM's loss reserves did not comply with applicable accounting standards; and that § 27-12-15, Ala.Code 1975, prohibited AIM's practice of allowing some of its policyholders to pay their annual insurance premiums in installments without first having filed certain documentation with the department concerning those installment payments.
AIM timely filed in the Montgomery Circuit Court ("the trial court") a petition for judicial review of the commissioner's administrative decision.[1]See § 27-2-32, Ala.Code 1975. On August 3, 2009, the trial court entered a judgment stating only that it affirmed the administrative decision, and it dismissed AIM's appeal. From that judgment, AIM timely appealed to this court.
This opinion first sets forth the facts underlying each of the issues in dispute and frames the issues to be reviewed. This court's analysis of each of those issues follows the recitation of all of the facts and the description of the underlying disputes.
Before the commissioner, the parties disagreed regarding whether AIM's compensation arrangement for one of its officers and directors is proper. The facts relevant to that issue are as follows. Charles Howard Moses III serves on the board of directors of, and is the secretary/treasurer for, AIM. Moses has served in those capacities since 1989, when AIM began its operations. We note that, in his testimony, Moses often referred to an affidavit he had executed pertaining to the issue of his compensation arrangement with AIM; AIM submitted that affidavit to the commissioner as an exhibit, and it is quoted later in this opinion. In essence, Moses's testimony was consistent with the statements set forth in the affidavit.
Moses testified that he has served as a director for AIM and that he has received the usual compensation paid to directors by a corporation. The fees paid to Moses for his services as a director are paid to him directly and are not included as part of the payment arrangement in dispute in this matter.
Moses also testified that since the inception of AIM he has provided a variety of services, including legal advice, to AIM. Moses explained that as AIM's secretary/treasurer he maintains the minutes of the company and its committees, and he maintains AIM's corporate records. Moses also stated that he reviews financial records, such as accounting and investing records, and various aspects of AIM's investment policy and practices.
Moses admitted that he signs some checks for AIM; Moses explained that he signs all checks of more than $50,000 and that he signs checks when Henry Henzel, AIM's president, is not available to do so. Moses also stated that he reviews the reconciliation of the monthly bank statement. In addition to the services already discussed, Moses provides some legal services to AIM.
Moses is not an employee of AIM. Rather, AIM pays Moses & Moses, P.C. ("Moses & Moses"), the law firm in which Moses is a partner, a retainer fee for the services Moses provides AIM. Moses stated that Moses & Moses is paid a legal-services retainer, although some of the services he provides are nonlegal services; Moses stated that many of the services he *5 provides in performing his duties as secretary/treasurer are ordinary business functions and are not confined to legal services.[2] Moses testified that he had never attempted to allocate the services he provided to AIM between purely legal services and business services. Moses explained the retainer-fee agreement between AIM and Moses & Moses by stating that "[i]t's the way in which AIM has chosen to and the Board has chosen to compensate me to do not only the legal services but the treasurer activities. Secretary certainly is a legal service."
Moses testified that he believes the current compensation arrangement complies with applicable law and that it is "the best and most economic and competitive way" for AIM to pay for the services he provides. Henzel, AIM's president, testified that he believed AIM received "more than [its] money's worth" from the services Moses provided AIM.
Moses testified that each year he presents to AIM's personnel committee a proposal for the amount he believes Moses & Moses should be paid for the services he provides AIM. According to Moses, the personnel committee then makes a recommendation regarding the payment for Moses's services to AIM's board of directors, of which Moses is a member. The evidence demonstrated that the annual retainer fee approved by AIM's board of directors for Moses's services is divided into equal monthly installments that AIM pays to Moses & Moses. Currently, Moses & Moses receives an $80,000 annual retainer from AIM.
Moses testified that he has been compensated pursuant to the retainer-fee arrangement for a number of years and that the department had not questioned that fee arrangement in its earlier examinations of AIM. Jim Hattaway, the insurance examination supervisor for the department, testified that it was not clear whether, during earlier examinations, AIM had disclosed its compensation arrangement with Moses or whether previous examiners had missed the issue. Hattaway testified that the department was made aware of the compensation arrangement during the examination period at issue, which was the reason the issue was being raised and discussed in the examination report.
Before the commissioner, Moses testified that the retainer AIM pays to Moses & Moses is not related to any specific transaction or asset of AIM. In essence, Moses's testimony at the ore tenus hearing was consistent with the assertions in his affidavit submitted to the commissioner in which Moses stated, in pertinent part:
"The duties for which the retainer is paid, which have not materially changed throughout the entire existence of the retainer relationship, include:
" Duties of the Secretary are the usual duties of a corporate secretary, e.g. attendance at meetings of the Board of Directors and committees and recording of minutes of the meetings and maintenance of the corporate records of [AIM].
" Duties of the Treasurer include preparation of reports and tax returns to be filed with appropriate governmental agencies, preparing summary reports to the Board, and assisting the investment custodian and investment advisors in the management of [AIM's] investments. The duties of the Treasurer do not include the supervision of the choice of any particular investment made by [AIM].

*6 " [Moses] also provides legal and other services for [AIM] pursuant to the Firm's retainer relationship which include advising on corporate law matters affecting the operations of [AIM]; assisting the Board of Directors, the President and Vice President-Underwriting in matters relating to the operations of [AIM]; and advising the Claims Committee or claims counsel on specific issues related to the legal experience and qualifications of [Moses]. In addition, certain tax planning and tax reporting matters are handled by [Moses] for [AIM].
"There is no aspect of the retainer paid to [Moses & Moses] that is related to any transaction involving the assets or reinsurance of [AIM]. All investment activity of [AIM] is within the framework of [AIM's] Investment Policy. The Board of Directors approves the Investment Policy of the Company not less frequently than annually based on the presentation and recommended changes by [AIM's] independent investment advisors and Investment/Audit Committee of [AIM]. Neither [Moses] nor [Moses & Moses] is, or has been, compensated for any investment transaction in which [AIM] is a party nor for the performance of [AIM's] investment portfolio. No broker, dealer, investment manager or investment adviser has ever provided any form of compensation to [Moses] or [Moses & Moses] at any time, directly or indirectly, related to any transaction involving the assets of [AIM], nor has [AIM] adjusted the retainer compensation in relation to any investment transactions in which [AIM] has engaged or planned to engage.
"No part of compensation to [Moses] or [Moses & Moses] is related to the placement of reinsurance, whether from the reinsurers or their intermediaries. [Moses] reviews reinsurance contracts and advises the President of [AIM] in the negotiation of these contracts, but has never had any relationship with any reinsurer, directly or indirectly, nor with any intermediary for a reinsurer."
Another issue in dispute pertains to AIM's maintenance of loss reserves. Loss reserves are an estimate of the liquid funds necessary to pay outstanding claims against an insurer's policyholders. The term "loss reserve" has been defined as "[t]hat portion of an insurance company's assets set aside for payment of losses which will probably arise or which have arisen but have not been paid." Black's Law Dictionary 946 (6th ed. 1990). With regard to that issue, the parties presented the following evidence and arguments.
The parties agreed that, in calculating its loss reserves, an insurance company must apply, among other things, Statement of Auditing Standard 73, referred to by the parties and the commissioner as "SAS 73," and Statement of Statutory Accounting Principal 55, referred to as "SSAP 55." SAS 73 is not contained in the record on appeal, and only some portions of SSAP 55 are set forth in the record.
The record indicates that SSAP 55 requires an insurance company determining its loss reserves to use the services of an actuary. SAS 73 pertains to how the services of a specialist such as an actuary are to be utilized. In essence, SAS 73 allows an accountant computing loss reserves to use the services of an independent actuary or, subject to certain caveats, an actuary employed in the same company as that accountant. Before the commissioner, the parties disputed the propriety of AIM's application of SAS 73 in selecting an actuary whose work would be used to formulate the recommendation of AIM's accountants as to the appropriate level of AIM's *7 loss reserves. The commissioner resolved that dispute in favor of AIM, determining that AIM's accountant had properly complied with SAS 73 in employing an actuary to assist in the calculation of AIM's loss reserves pursuant to SSAP 55.[3] The department has not challenged that determination; therefore, AIM's compliance with SAS 73 is not an issue on appeal.
The parties dispute whether AIM properly complied with SSAP 55 in reaching its determinations regarding the amount of its annual loss reserves during the period covered in the examination report. The department presented evidence from an actuary regarding the propriety of AIM's estimates of its loss reserves, and AIM has disputed the qualification of an actuary to comment on loss reserves calculated under SSAP 55, an accounting standard.
The department argues that AIM's loss reserves were "redundant" and that they far exceeded the amount of loss reserves necessary. Randall Ross, the actuary who testified on behalf of the department, testified that the loss-reserves portion of the examination report is actually a compromise worked out between AIM and the department. According to Ross, the department had originally proposed to adjust AIM's loss reserves but subsequently agreed to withdraw that recommendation and substitute language specifying that AIM use a more reasonable approach in the future.[4] However, AIM did not find that language to be satisfactory, and it is that language with which AIM now takes issue.
In explaining the department's objection to the manner in which AIM determined *8 its loss reserves, Ross stated that AIM utilized a "pricing approach" in determining the amount of its annual loss reserves. The parties presented evidence indicating that, for the year 2003, AIM maintained loss reserves of $7.1 million; Ross testified that AIM had consistently held loss reserves of approximately $7 million "year after year." According to Ross, loss reserves of $2 million to $3 million would have been more appropriate.
Ross testified that, although a conservative approach is a goal from a regulatory standpoint, actuarial standards require that loss reserves "be reasonable, and not just conservative." Ross did not believe that AIM's loss reserves were reasonable. Ross explained that the high end of a reasonable range of loss reserves was 10% to 20% over or above a reasonable estimate of loss reserves. Ross estimated that AIM's loss reserves were "154 percent above what we consider to be [a] reasonable" loss-reserve estimate. Ross admitted, however, that he had never before evaluated the loss reserves for a "one-state, monoline" insurance provider such as AIM.
AIM presented evidence indicating that its policy was to maintain a conservative amount of estimated loss reserves. AIM presented evidence from its accountants indicating that the accountants had relied on their actuary to provide AIM with a range of amounts for determining loss reserves; AIM selected an amount on the upper, or more conservative, end of that recommended range. In his testimony, Moses explained that AIM had "been extremely cautious about being comfortable that actuarial numbers alone should guide us in making a decision as managers as to what those reserve levels should be."
Larry B. Frost, a certified public accountant hired by AIM as an independent auditor, testified regarding the manner in which AIM's loss reserves were calculated. Frost explained the assumptions and calculations utilized by the actuary employed by his firm to assist in the recommendation for AIM's loss reserves, and he stated that he believed that all computations were made in compliance with SSAP 55.[5] Frost stated that he believed that AIM's loss reserves were reasonable and that he favored an insurance company's employing a conservative approach to the estimation of loss reserves.
Mary Lou Rutherford, a certified public accountant in the same firm as Frost, confirmed Frost's testimony and his conclusion *9 that AIM had complied with SSAP 55. Rutherford testified that
"an actuarial calculation is an estimate. And as we have established, we are not qualified to determine whether those numbers are correct or not. We look at the actuary's professional qualifications, [his or her] reputation, those kinds of things. And we look at [his or her] methodology and make sure that the assumptions are the sameare reasonable and the same as in the prior year. And then what I do is I look at [his or her] opinion ... and I guess in the case of most actuaries, they give a range."
Rutherford stated that for the year ending December 31, 2005, the actuary employed by AIM's accountants had recommended a loss-reserves estimate range between $6.6 million and $9.3 million; the actuary's "best estimate" for loss reserves for that year was $8.3 million. According to Rutherford, based on that recommendation, AIM established its loss reserves for 2005 at $8.6 million, or $300,000 over the actuary's best estimate of its potential need for loss reserves.
Another issue in dispute before the commissioner was AIM's practice of allowing some of its policyholders to make installment payments toward their annual premiums. The department alleged that AIM's installment-payment plan also violated applicable statutory law. The department asserted that AIM could allow installment payments but that, in order to do so, AIM was required to file an endorsement with the department and obtain department approval of that endorsement. After the release of the examination report at issue in this matter, AIM did file the required endorsement allowing it to adjust its contracts so as to collect premiums in installments. See § 27-14-8(a), Ala.Code 1975. However, it is undisputed that endorsement was not effective for the period at issue in the examination report.
The evidence on the issue of AIM's practice of allowing installment payments indicated that some of AIM's approximately 3,000 policyholders had difficulty paying their premiums in an annual lump sum as required by the terms of their insurance contracts with AIM. AIM allowed 30 to 60 of those policyholders to pay their annual premiums in monthly, quarterly, or semiannual installments.
Henry Henzel, AIM's president, explained that AIM allowed some of its policyholders to pay in installments in order to allow policyholders with cash-flow problems to obtain malpractice insurance. Henzel stated that the practice benefitted both the attorney-policyholder and the attorney's clients. Henzel testified AIM had no policy in place determining which policyholders could pay on an installment basis; it appears that AIM staff would make decisions allowing installment payments of annual premiums on an individual basis. According to Henzel, when AIM had allowed a policyholder to pay his or her annual premium in installments, AIM had provided insurance coverage only for the period for which the policyholder had paid. It is undisputed that no fee or interest was charged to those policyholders allowed to make their premium payments in installments.
On questioning from the commissioner, Henzel denied that AIM's installment-payment practice was discriminatory, but he admitted that many other policyholders would like to pay their annual premiums in installments. Henzel explained that AIM could not allow all of its policyholders to pay in installments without incurring the additional expense of hiring additional staff to manage those payments.

Standard of Review
Section 27-2-32, Ala.Code 1975, governs appeals from the decision of the commissioner *10 to the trial court as well as appeals to this court from the judgment of the trial court. "Pursuant to [§ 27-2-32(e)], the commissioner's decision or order shall be taken as prima facie just and reasonable." Old Southern Life Ins. Co. v. State Dep't of Ins., 537 So.2d 30, 31 (Ala.Civ.App. 1988); see also State Dep't of Ins. v. Arthur J. Gallagher & Co., 622 So.2d 370, 371(Ala.Civ.App.1993). For both the trial court and this court, the applicable standard of review is the same:
"The court shall reverse, vacate or modify the commissioner's decision or order in whole or in part if it finds that:
"(1) The commissioner erred to the prejudice of appellant's substantial rights in his application of the law;
"(2) The decision or order was procured by fraud or was based upon a finding of facts contrary to the weight of the evidence; or
"(3) The commissioner's action was arbitrary and capricious."
§ 27-2-32(e), Ala.Code 1975.

Burden of Proof
AIM argues on appeal that this court should "clarify" which party bears the burden of proof in this matter. Before the trial court, AIM only argued that under Rule 7 of Regulation 482-1-065-.04, Ala. Admin. Code (Dep't of Ins.), the department had the burden of proof as to the conclusions reached in the examination report. We note, however, that each of the parties asserts that the issues in dispute in this matter involve only questions of law and not questions of fact. See AIM's brief, pp. 27-28.[6] In other portions of its brief, AIM questions whether the department's evidence was sufficient to support the commissioner's decision. Out of an abundance of caution, we briefly address AIM's arguments pertaining to the parties' respective burdens of proof.
With regard to respective burdens of proof, the applicable regulation provides:
"(d) Burden of ProofGeneral Rule. As in civil cases at law, as a general rule, the party asserting an affirmative issue alleged in the pleadings has the burden of proving said issue by a preponderance of the evidence.
"(e) Burden of ProofNegative Allegation. The party asserting a negative allegation has the burden of proving said negation by only slight evidence, which then shifts to the other party the burden of proving said issue by a preponderance of the evidence."
Rule 7, Regulation 482-1-065-.04.
AIM cursorily contends in its brief on appeal that "since the allegations by AIM *11 in this proceeding are negative allegations, the burden of proof shifts to the department to prove the allegations contained in the [examination] report by a preponderance of the evidence." AIM relies on the definition of "negative averment" found in Black's Law Dictionary, which has defined that term as follows:
"As opposed to the traverse or simple denial of an affirmative allegation, a negative averment is an allegation of some substantive fact, e.g., that premises are not in repair, which, although negative in form, is really affirmative in substance, and the party alleging the fact of non-repair must prove it. An averment in some of the pleadings in a case in which a negative is asserted."
Black's Law Dictionary 1031-32 (6th ed. 1990).
In its brief before this court, AIM does not explain or identify what it contends are the "negative allegations" it has asserted in this matter. AIM maintained at the oral argument before this court that the department's examination report constituted the initiation of this action, and it alleged that the examination report was, in essence, a complaint. Therefore, it maintained that the department had asserted an "affirmative issue." See Rule 7(d), Regulation 482-1-065-.04. Thus, we interpret AIM's argument as asserting that the objections to the conclusions contained in the examination report that it raised before the commissioner constitute "negative allegations." We cannot agree.
AIM has contended that the examination report itself constituted a complaint initiating this action. However, § 27-2-24(b), Ala.Code 1975, specifies that an examination report "shall be admissible in evidence in any action or proceeding brought by the commissioner against the person examined, or against its officers, employees or agents." Thus, because the examination report is admissible in evidence in an "action or proceeding brought by the commissioner," it is clear that in enacting § 27-2-24 the legislature did not intend that the examination report itself would constitute a complaint that initiates an "action or proceeding brought by the commissioner."
Further, the department is required by statute to conduct an examination of an insurance company "not less frequently than once every five years." § 27-2-21(a), Ala.Code 1975. The department conducted that required examination of AIM, and it issued a report of that examination. AIM was not satisfied with several of the conclusions in the examination report. AIM then exercised its right to request a hearing before the commissioner. See § 27-2-24(a), Ala.Code 1975 (If requested by a person aggrieved by an examination report, "the commissioner shall grant a hearing with respect to the report...."); see also § 27-2-28(b), Ala.Code 1975 ("The commissioner shall hold a hearing if required by any provision, or upon written demand therefor by a person aggrieved by... any report, rule, regulation or order of the commissioner....").
Section 27-2-28(b), Ala.Code 1975, specifies that a demand for a hearing by a person or company aggrieved by a report of the department "shall specify the grounds to be relied upon as a basis for the relief to be demanded at the hearing...." In its request for a hearing before the commissioner, AIM detailed its objections to many of the conclusions reached by the department in the examination report, and it requested as relief "that the commissioner ... require modifications to the [examination] report to address the objections made in this letter." Thus, AIM asserted a claim seeking affirmative relief from the commissioner; specifically, AIM sought a determination that the department had erred in reaching certain *12 conclusions in the examination report and asked that the department be required to modify those portions of the examination report to which it objected. Accordingly, because we conclude that AIM was the party seeking relief from the commissioner, we cannot agree with its argument that the department initiated this action through its issuance of the examination report. Given the procedural posture of this case and the relief sought by AIM with regard to the examination report, we conclude that AIM, as the party seeking relief, was the party asserting an "affirmative issue," as that term is used in Rule 7(d), Regulation 482-1-065-.04. Accordingly, AIM was required to demonstrate its entitlement to relief by a preponderance of the evidence.

Compensation of Officer of AIM
AIM argues that the trial court erred in affirming the commissioner's finding that the retainer fee AIM pays to Moses & Moses for the services Moses provides AIM violates § 27-27-26(a). In the examination report, the department concluded that AIM had violated § 27-27-26 because it had compensated Moses, who is both an officer and a director of AIM, for both legal and nonlegal work for AIM. Section 27-27-26 provides:
"(a) Any officer, or director, or any member of any committee or any employee of a domestic insurer who is charged with the duty of investing or handling the insurer's funds shall not deposit or invest such funds except in the insurer's corporate name; except, that such insurer may for its convenience hold any equity investment in a street name or in the name of a nominee; shall not borrow the funds of such insurer; shall not be pecuniarily interested in any loan, pledge or deposit, security, investment, sale, purchase, exchange, reinsurance, or other similar transaction or property of such insurer except as a stockholder or member and shall not take or receive to his own use any fee, brokerage, commission, gift, or other consideration for, or on account of, any such transaction made by, or on behalf of, such insurer.

"(b) No insurer shall guarantee any financial obligation of any of its officers or directors.
"(c) This section shall not prohibit such a director, or officer, or member of a committee or employee from becoming a policyholder of the insurer and enjoying the usual rights so provided for its policyholders, nor shall it prohibit any such officer, director, or member of a committee or employee from participating as beneficiary in any pension trust, deferred compensation plan, profit-sharing plan, or stock option plan authorized by the insurer and to which he may be eligible, nor shall it prohibit any director or member of a committee from receiving a reasonable fee for legal services actually rendered to such insurer.

"(d) The commissioner may, by regulations from time to time, define and permit additional exceptions to the prohibition contained in subsection (a) of this section solely to enable payment of reasonable compensation to a director who is not otherwise an officer or employee of the insurer, or to a corporation or firm in which a director is interested, for necessary services performed or sales or purchases made to, or for, the insurer in the ordinary course of the insurer's business and in the usual private professional or business capacity of such director or such corporation or firm."
(Emphasis added.)
AIM, relying on that part of § 27-27-26(a) that prohibits an officer or director from taking or receiving "any fee, brokerage, *13 commission, gift, or other consideration for, or on account of, any such transaction made by, or on behalf of, such insurer," advances a narrow interpretation of subsection (a). AIM contends that subsection (a) prohibits an officer or director from receiving a "fee, brokerage, commission, gift, or other consideration" related to a specific transaction conducted by AIM. In other words, AIM argues that the compensation arrangement for Moses is permissible because, it contends, the retainer fee it pays to Moses & Moses is not related to any specific "loan, pledge or deposit, security, investment, sale, purchase, exchange, reinsurance, or other similar transaction or property of" AIM. See § 27-27-26(a). Thus AIM, specifically advocates a "transaction based" interpretation of § 27-27-26(a).[7]
The department contends, however, that AIM's payment of the retainer fee to Moses & Moses for Moses's services is, in itself, a "sale, purchase, exchange, reinsurance, or other similar transaction or property" of AIM in which Moses is "pecuniarily interested." See § 27-27-26(a). Through his compensation arrangement with Moses & Moses, Moses admittedly receives income from a portion of the retainer fee paid by AIM to Moses & Moses.
We agree with the department that the retainer fee is a transaction similar to those addressed in § 27-27-26(a). Our conclusion is supported by the exception, set forth in subsection (c) of § 27-27-26, that allows, under certain circumstances, a director or committee member to receive a legal fee. The fact that the legislature excluded the payment of legal fees from the application of § 27-27-26(a) indicates that such a payment constitutes a "similar transaction" as that term is used in § 27-27-26(a). Payment for legal services provided is encompassed within the retainer-fee arrangement between AIM and Moses & Moses. It is undisputed that Moses has a pecuniary interest in the retainer fee paid to Moses & Moses. Accordingly, we agree with the commissioner's conclusion that the payment of the retainer fee itself is a transaction that violates § 27-27-26(a), Ala.Code 1975.[8]
Even assuming that the retainer-fee compensation arrangement is not in itself a transaction that violates § 27-27-26(a), we affirm as to this issue based on the commissioner's interpretation of the entirety of § 27-27-26. The department has advocated a broader interpretation of § 27-27-26(a) than the one advocated by AIM. The department contends that § 27-27-26(a) sets forth a broad prohibition from which narrow exceptions are carved out in subsequent subsections of the statute. The commissioner agreed *14 with the department's argument that § 27-27-26(a) sets forth a broad prohibition; the department summarized its analysis on the issue as follows:
"AIM's interpretation of § 27-27-26(a), moreover, does not account for all aspects of § 27-27-26 in general, which, the department maintains, must be read together. That the `pecuniary interest' prohibition must be broadly construed not narrowly limited to discrete `transactions'follows from `exception' language set forth in subsections (c) and (d). More specifically, according to § 27-27-26(c), the `pecuniary interest' statute does not prohibit a director, officer, committee member, or employee from being a policyholder of an insurer; from participating as a beneficiary in a pension trust, deferred compensation plan, and so forth; `nor shall it prohibit any director or member of a committee from receiving a reasonable fee for legal services actually rendered to such insurer.' Section 27-27-26(d), not cited by AIM, says the commissioner can, by regulation, define `additional exceptions' `solely to enable payment of reasonable compensation to a director who is not otherwise an officer or employee of the insurer, or to a corporation or firm in which the director is interested, for necessary services performed or sales or purchases made to, or for, the insurer in the ordinary course of the insurer's business and in the usual private professional or business capacity of such director or such corporation or firm.' The fact of the `exceptions' in § 27-27-26(c) and the potential for additional `exceptions' by regulation as allowed by § 27-27-26(d) show a legislative intent that the general prohibitions in § 27-27-26(a) have a broad sweep. For example, even if the reference in § 27-27-26(a) to `transaction' has as much significance as AIM says it does, it is apparent from § 27-27-26(d) that a `transaction' also embraces a more `ordinary course' arrangement like that involving Mr. Moses unless, by regulation, the commissioner has recognized an `exception' for that (which has not occurred)."
We note that the department's interpretation of § 27-27-26 should be given deference by the courts. Ex parte State Dep't of Revenue, 683 So.2d 980, 983 (Ala.1996); Farmer v. Hypo Holdings, Inc., 675 So.2d 387, 390 (Ala.1996). Our supreme court has explained:
"[I]t is well established that in interpreting a statute, a court accepts an administrative interpretation of the statute by the agency charged with its administration, if the interpretation is reasonable. Alabama Metallurgical Corp. v. Alabama Public Service Commission, 441 So.2d 565 (Ala.1983). Absent a compelling reason not to do so, a court will give great weight to an agency's interpretations of a statute and will consider them persuasive. Moody v. Ingram, 361 So.2d 513 (Ala.1978)."
Ex parte State Dep't of Revenue, 683 So.2d at 983. See also State v. Pettaway, 794 So.2d 1153, 1157 (Ala.Civ.App.2001) ("[I]t is well established that in interpreting a statute, a court accepts an administrative interpretation of the statute by the agency charged with its administration, if that interpretation is reasonable."). "The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute." IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992). When possible, the legislature's intent in enacting the statute should be discerned from the language of the statute. Perry v. City of Birmingham, 906 So.2d 174, 176 (Ala.2005).
*15 Subsection (c) of § 27-27-26 specifically allows, as an exclusion from the application of the rest of the statute, the payment of a fee for legal services to a director or a committee member of an insurance company. Subsection (d) of § 27-27-26 allows a further exception, at the discretion of the commissioner, for the payment of reasonable compensation for a director "who is not otherwise an officer or employee of the insurer." Thus, the exceptions to subsection (a) of § 27-27-26 contained in subsections (c) and (d) of that statute allow, under certain limited circumstances, a director of a company to receive payment for legal fees or for some other services. Subsections (c) and (d) of § 27-27-26 do not provide similar exceptions for officers of an insurance company such as AIM. The commissioner's and the trial court's interpretation of § 27-27-26 gives full effect to the exceptions to § 27-27-26(a) that are set forth in subsections (c) and (d) of that statute. We agree with that interpretation, and we reject AIM's "transaction based" interpretation of § 27-27-26(a).
In reaching this holding, we note that AIM has confined its arguments on this issue to its theory that § 27-27-26(a) is specific-transaction based. AIM has not argued that, assuming the department's interpretation is correct and the compensation arrangement with Moses is impermissible under § 27-27-26(a), the payment of the retainer fee falls within one of the exceptions set forth in § 27-27-26(c) and (d).[9]
We note that, as part of its argument on this issue, AIM contends that, before the examination period at issue, the department had never questioned its manner of compensating Moses. AIM contends that this court ignored the department's "historical interpretation" of the compensation arrangement. However, the record indicates that Hattaway testified that AIM had not documented its compensation arrangement with Moses in writing, and there is no evidence indicating that AIM had previously disclosed the specifics of that compensation arrangement to the department. Hattaway testified that the department objected to the compensation arrangement when it became aware of it during the examination period at issue. *16 Even assuming that the compensation arrangement previously had been disclosed to the department, there is no indication that the department approved that arrangement in the past so as to make the department's current position inconsistent with any previous rulings or decisions. Accordingly, given the facts of this case, we cannot say that AIM has demonstrated that the department should be barred from objecting to AIM's compensation of Moses based on the department's failure to cite the compensation arrangement as objectionable in earlier examination reports.
Based on the arguments presented by the parties in this case, the commissioner and the trial court concluded that Moses is an officer of AIM and receives payments of the type prohibited by § 27-27-26(a). AIM has failed to demonstrate that the commissioner and the trial court erred in reaching those determinations.
In its examination report, the department set forth various recommendations that would allow AIM to bring its compensation arrangement with Moses into compliance with § 27-27-26. In pertinent part, the examination report stated:
"It is recommended that [AIM] comply with the provisions of Ala.Code § 27-27-26 (1975), by requiring [Moses], as an officer [AIM], to do one of the following:
"(1) to do no work for [AIM];
"(2) receive no fee for any work he does;
"(3) become a part-time employee and officer who will be paid as same; or
"(4) resign as an officer of [AIM] and do only his work as a director on retainer."
In his decision, later affirmed by the trial court, the commissioner ordered that AIM amend its compensation arrangement with Moses in order to comply with any of the recommendations set forth in the examination report. AIM has argued that Moses's experience would be difficult to replace and that its compensation arrangement with Moses is the most efficient manner in which AIM can obtain the services Moses provides. However, we cannot agree that a purported lack of efficiency in the compensation arrangement makes the commissioner's and the trial court's rejection of that arrangement as violative of § 27-27-26 unjust or unreasonable. See Old Southern Life Ins. Co. v. State Dep't of Ins., 537 So.2d at 31.
AIM also contends that it is not an uncommon business practice for a corporate officer to be elected as a director, or for the duties of a corporate officer such as a corporate secretary to be performed by a "general counsel or in-house counsel." Section 27-27-26 in no way prohibits officers of a corporation from also serving as directors; nor does it prohibit corporate employees such as general counsel or in-house counsel from performing or assisting with the duties of a corporate secretary. In fact, one of the recommendations of the examination report included Moses becoming an employee of AIM. Given the arguments presented to this court, we cannot say that AIM has demonstrated that the decision regarding AIM's compensation of Moses made by the commissioner and affirmed by the trial court was unjust or unreasonable, see Old Southern Life Ins. Co. v. State Dep't of Ins., supra, or that it was arbitrary or capricious. § 27-2-32(e), Ala.Code 1975. Accordingly, we affirm as to this issue.[10]

*17 Calculation of Loss Reserves

AIM also challenges the trial court's affirmance of what it characterizes as the commissioner's determination that its loss reserves were too conservative during the period covered in the examination report. The department contends, however, that it did not require AIM to restate its reserves for the period covered by the examination report and that it instead recommended a change for the future in the method in which AIM's loss reserves are calculated. Accordingly, the department questions whether this issue is justiciable.
With regard to the issue of loss reserves, the department's examination report states, in pertinent part:

 "Note 4Losses $3,238,000
 ---------------------------------------
 "Loss adjustment expenses $3,877,000

"The referenced liabilities for losses and loss adjustment expenses (LAE) are the same as the amounts reported by [AIM] in its 2005 Annual Statement.
"[AIM] uses a loss ratio method to establish loss and LAE reserves that were booked in the 2005 Annual Statement. The ratios are judgmentally selected by management, with consideration of the opining actuary's estimated range of reserves.
"In the reserve opinion, the actuary characterized [AIM's] 2005 reserves as reasonable. The booked reserves were within the appointed actuary's range.
"It is the actuarial examiner's opinion that [AIM's] recorded reserves were redundant. The booked reserves have been established on a consistent basis with past practices. The runoff of previously established reserves has consistently been favorable. The examining actuary's independent reserves estimates are significantly less than those recorded by [AIM] and those estimated by the appointed actuary.
"During the course of the examination, the actuarial examiners and the appointed actuary discussed the appointed actuary's methods and assumptions and selection process. They also discussed concerns raised by the actuarial examiners regarding some of the methods and assumptions used and the weights given the various methods in the reserve selection process. The appointed actuary has agreed to address these concerns in future actuarial reports and opinions. Because the appointed actuary has agreed to address these concerns, and given that reserves were conservatively recorded consistent with past practices, no adjustments to reserves were made in this examination report.
"[AIM] did not allocate any LAE reserves to adjusting and other (A & O) expenses.
"As was discussed previously in this report under the `Claims Committee' (see page 8) and `Claims Handling Practices' *18 (see page 20) captions, [AIM's] management asserted attorney-client privilege and did not provide claims committee minutes. In addition, certain documentation was removed from claims files requested by the examiners. The full extent of missing documentation could not be determined. Because of the redaction, the examiners were not able to determine if [AIM] was adjusting case reserves appropriately. However, based on ultimate payout history, [AIM's] case reserves have historically been adequate, on average.
"[AIM] included unpaid loss adjustment expense claim amounts at year-end 2002, 2003, 2004, and 2005, in the `Other expenses' liability line item instead of in the `Loss adjustment expense' liability item, and also included these unpaid claim amounts as being paid within Schedule P at the respective year-ends when these payments were not actually disbursed until January of the following calendar year. These items were incorrectly classified in the wrong liability account as being paid within Schedule P, which was not in accordance with the [National Association of Insurance Commissioner's] Annual Statement Instructions. The amount at December 31, 2005, was $821, which was deemed immaterial, and therefore, constituted no changes to [AIM's] financial statements in this examination report."
(Emphasis in original.)
In the "Comments and Recommendations" section of the examination report, the department stated the following on the issue of loss reserves:
"Losses and Loss adjustment expensesPage 34
"It is recommended that [AIM] record reserves at a level, in future Annual Statements, in accordance with SSAP No. 55, paragraphs 8 and 9, of the [National Association of Insurance Commissioner's] Accounting Practices and Procedures Manual, which require, in pertinent part, that the `liability for claim reserves and claim liabilities, unpaid losses, and loss/claim adjustment expenses shall be based upon the estimated ultimate cost of settling the claims (including the effects of inflation and other societal and economic factors), using past experience adjusted for current trends, and any other factors that would modify past experience...' and `[t]he decision to use a particular projection method and the results obtained from that method shall be evaluated by considering the inherent assumptions underlying the method and the appropriateness of those assumptions to the circumstances.'
"It is recommended that [AIM] classify all unpaid loss adjustment claims expenses in the Loss adjustment expense liability and not consider these as paid, but as unpaid, within Schedule P until a disbursement is actually made in accordance with the [National Association of Insurance Commissioner's] Annual Statement Instructions."
(Emphasis in original.)
As noted in the above-quoted portion of the examination report, AIM agreed to modify for the future the manner in which it calculated its loss reserves pursuant to SSAP 55. However, during arguments before the commissioner, AIM's attorney explained that AIM was disputing the accuracy of the department's assertion in the publicly available examination report that there existed redundancies in AIM's determination of its loss reserves. AIM's attorney also argued that the requirement set forth in the examination report that AIM comply in the future with SSAP 55 implied that it had not done so during the period addressed in the examination report. *19 During oral argument before this court, AIM's attorney stated that the perception might be derived from the examination report that AIM was not in compliance with SSAP 55 and that perception could affect AIM's rating status for the purpose of obtaining reinsurance.
A "justiciable controversy" is one that is "`definite and concrete, touching the legal relations of the parties in adverse legal interest, and it must be a real and substantial controversy admitting of specific relief through a [judgment].'" MacKenzie v. First Alabama Bank, 598 So.2d 1367, 1370 (Ala.1992) (quoting Copeland v. Jefferson County, 284 Ala. 558, 561, 226 So.2d 385, 387 (1969)). In this case, the department, in its examination report, did not require AIM to restate its loss reserves; however, the findings set forth in its report concerning AIM's method of calculating its loss reserves indicate that the department disagreed with the manner in which AIM had calculated those reserves during the period covered in the examination report. We also note that the record demonstrates that the department's recommendation that AIM comply with SSAP 55 is a compromise position from its original recommendation that AIM's loss reserves be restated. See supra note 4. Given the foregoing, we conclude the facts of this case created a sufficiently justiciable dispute to support resolution by the courts.
Accordingly, we turn to AIM's argument that the trial court erred in affirming that part of the administrative decision in which the commissioner ordered AIM "to comply with [the] Examination Report with respect to SSAP 55." Under the department's estimate, AIM should have had loss reserves of approximately $2 million to $3 million rather than the approximately $7 million it set aside annually as loss reserves for the years covered in the examination report. The department presented evidence from its actuary indicating that, in establishing its loss reserves, AIM had used a pricing approach rather than an actuarial estimate of loss reserves. Accordingly, the department, after consulting AIM's actuary, recommended that AIM make certain adjustments to the assumptions and weights used by the actuary in calculating AIM's loss reserves pursuant to SSAP 55.
In response, AIM argues that SSAP 55 is an accounting standard and not an actuarial rule. Therefore, according to AIM, because the department presented the testimony of an actuary rather than an accountant, its evidence pertaining to the calculation of loss reserves pursuant to an accounting standard was without credibility or weight. That argument, however, ignores the fact that the parties did not dispute that SSAP 55 requires the use of an actuary in determining loss reserves. In discussing the issue of loss reserves, both the department and AIM presented evidence pertaining to the assumptions and methods employed by their respective actuaries in calculating loss reserves. The testimony of Frost and Rutherford established that the range of loss reserves reached by the actuary was presented to AIM and that AIM then selected its loss reserves from that range established by the actuary. Frost based his conclusion that AIM had complied with SSAP 55 in part on the fact that AIM had selected an amount within the range established by the actuary. Accordingly, we cannot agree that the commissioner or the trial court erred in considering the testimony of the department's actuary.
However, we do agree with AIM that the trial court erred in affirming the commissioner's determination that AIM's loss reserves were not reasonable. AIM provides malpractice insurance for attorneys *20 located in the State of Alabama. It is a single-state, single-line insurance company. According to AIM's president, Henry Henzel, there is little room for error in running AIM because of its smaller size and its lack of diversification. Henzel explained that AIM took into account both the frequency of claims and the severity of claims when deciding on loss reserves. According to Henzel, because both frequency and severity varied greatly from year to year, and because difficult economic periods tended to produce more claims, AIM was cautious and conservative with its loss reserves.
The evidence before the commissioner and, thus, before the trial court indicated that the department's actuary, Randy Ross, disagreed with the recommendation regarding AIM's loss reserves proposed by the independent actuary used by AIM. Ross described AIM's loss reserves as "conservative but not reasonable." Although Ross agreed that loss reserves should be conservative, he insisted that they must also be reasonable. Ross admitted, however, that he had never performed actuarial services for a bar-related insurer who was "one-state, monoline." He also admitted that he had not undertaken an onsite review with AIM's claims personnel to discuss AIM's claims history. Notably, Ross stated that AIM's more conservative loss reserves did not adversely affect AIM or its policyholders.
We cannot agree that the commissioner, under the guise of determining whether loss reserves are "reasonable," may determine that conservative loss reserves that do not adversely affect the insurer or its insureds are unreasonable. The issue in this case comes down to a difference in opinion among two actuaries. The evidence reflects that AIM's loss reverses are conservative, as they always have been, and AIM and its insureds are protected by and not negatively impacted by those conservative loss reserves. The commissioner's adoption of the department's report regarding AIM's loss reserves is arbitrary, being based only on a dispute between actuaries about loss-reserve amounts with no proof that actual harm to AIM or its insureds will result from the higher loss reserves AIM has opted to use. See Alabama Dep't of Human Res. v. Dye, 921 So.2d 421, 426 (Ala.Civ.App.2005) (stating that, although review under the arbitrary-and-capricious standard is narrow, a reviewing court may look to see if the agency has an explanation that rationally connects the facts and the decision reached). Thus, that portion of the trial court's judgment affirming the commissioner's decision with regard to loss reserves is reversed.

Propriety of Installment Payments of Premiums
The trial court also upheld the commissioner's determination that AIM had improperly allowed some of its policyholders to pay their insurance premiums in installments during the period addressed in the examination report. In support of its position that installment payments were not permissible (in the absence of endorsements properly filed with the department),[11] the department relied on § 27-12-14(a), Ala.Code 1975, which provides:
"(a) No property, casualty or surety insurer, or any employee thereof, and no broker, agent or solicitor shall pay, allow or give, or offer to pay, allow or give, *21 directly or indirectly, as an inducement to insurance or after insurance has been effected, any rebate, discount, abatement, credit, or reduction of the premium named in a policy of insurance, or any special favor or advantage in the dividends or other benefits to accrue thereon or any valuable consideration or inducement whatever not specified in the policy except to the extent provided for in rating systems filed with the commissioner by, or on behalf of, the insurer and approved by the commissioner."
(Emphasis added.)
AIM argues that § 27-12-14 is designed to prevent the discounting of premiums, and it contends that in allowing some of its policyholders to pay their annual premiums in installments it did not afford those policyholders a discount. AIM asserts that, pursuant to its installment-payment practice, those policyholders paid the full price for coverage, albeit only for the periods covered by the installment payments. Accordingly, AIM contends that its installment-payment policy did not afford those policyholders who paid in installments a discount or reduction in the amount of their premiums.
The department contends, however, that allowing some policyholders to pay their annual premiums in installments constituted valuable consideration to those policyholders. The department alleges that AIM's installment-payment practice did, in fact, confer a favor or advantage upon those policyholders allowed to pay in installments. Even Henzel, AIM's president, conceded that many other of AIM's policyholders would like to pay their annual premiums in installments.
The department further contends that the installment-payment practice constitutes an impermissible inducement under § 27-12-14. In response to the department's argument that the installment-payment practice constitutes an inducement prohibited by § 27-12-14(a), AIM argues only that its practice has benefitted attorneys who would not otherwise have been able to purchase malpractice insurance. It is undisputed that AIM's intent in allowing installment payments for some of its policyholders was to provide malpractice-insurance coverage for those policyholders who claimed they could not afford a one-time annual lump-sum payment. We recognize the benefit AIM attempted to bestow upon its policyholders who were unable to afford an annual lump-sum premium payment. However, in allowing installment payments of premiums for some of the holders of its policies, AIM made available to those policyholders insurance that, according to AIM, the policyholders could not have otherwise purchased. By doing so, AIM induced policyholders who would not otherwise have purchased insurance from it to do so. Further, it did so under terms not available to most of its policyholders and in a manner that constituted a valuable benefit or consideration to the policyholders who were allowed to pay in installments. We also note that AIM, by complying with the filing requirements of § 27-14-8, could have accomplished its goal of providing legal-malpractice insurance coverage to those policyholders who were unable to make an annual lump-sum payment.
The trial court afforded deference to the interpretation of § 27-12-14 reached by the department. See Ex parte State Dep't of Revenue, supra; and Farmer v. Hypo Holdings, Inc., supra. We agree with the department's interpretation, and with the trial court's decision to affirm the determination of the commissioner, in which the commissioner stated that, "[a]lthough AIM has complied after the fact in regards to allowing insured to pay premiums in installments, during the period cover[ed in *22 the examination report,] AIM was in violation of § 27-12-14." We cannot say that AIM has demonstrated that the trial court erred in affirming the decision of the commissioner on the issue of the installment payment of premiums during the period covered in the examination report.

Compliance Issue
AIM also raises an issue pertaining to the department's purported compliance with the decisions of the commissioner and the trial court. In his ruling, the commissioner disagreed with the department and ruled in favor of AIM on an issue pertaining to the manner in which AIM maintains certain claims records. The trial court summarily affirmed the decision of the commissioner as to this issue in its June 3, 2009, judgment, and the department did not appeal that part of the judgment in favor of AIM.
Before this court, AIM alleges that the department has not modified the examination report to reflect the commissioner's and the trial court's rulings on the issue of the claims records. AIM seeks an order from this court requiring the department to make certain adjustments to the examination report.[12]
In Olson v. State, 975 So.2d 357 (Ala.Civ. App.2007), a trial court, on return from remand, entered a judgment ordering that certain items seized by the State of Alabama be returned to Olson. Olson appealed to this court, alleging that the State of Alabama had failed to return the items to him. This court affirmed the trial court's judgment, noting that there was no adverse ruling for this court to review. In so holding, this court explained:
"The State's purported failure to return the items to Olson is not attributable to any adverse ruling by the circuit court. Generally, a party may appeal only an adverse ruling. CSX Transp., Inc. v. Day, 613 So.2d 883, 884 (Ala.1993) (`[I]t is familiar law that an adverse ruling below is a prerequisite to appellate review.'); Figures v. Figures, 658 So.2d 502, 504 (Ala.Civ.App.1994) (`The only matter for [the appellate court's] consideration is an adverse ruling of the trial court. Davis v. Hartford Accident & Indemnity Co., 335 So.2d 688 (Ala.Civ. App.1976).'); and Rountree v. Sanders, 413 So.2d 1159, 1159-60 (Ala.Civ.App. 1982) (`Upon an appeal, only adverse rulings of the trial court will be reviewed.'); see also Public Serv. Comm'n of Missouri v. Brashear Freight Lines, Inc., 306 U.S. 204, 206-07, 59 S.Ct. 480, 83 L.Ed. 608 (1939) (stating that the successful party below lacked the right to appeal from a decree denying an injunction)."
Olson v. State, 975 So.2d at 359.
Similarly, in this case, there is no adverse ruling of the trial court with regard to the department's alleged failure to modify the examination report in compliance with the decisions of the commissioner and the trial court. Accordingly, we affirm as to this argument. Olson v. State, supra.
APPLICATIONS FOR REHEARING OVERRULED; OPINION OF AUGUST 13, 2010, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
PITTMAN, THOMAS, and MOORE, JJ., concur.
BRYAN, J., concurs in the rationale in part and concurs specially in part, with writing.
THOMPSON, P.J., concurs in part and dissents in part, with writing.
*23 BRYAN, Judge, concurring in the rationale in part and concurring specially in part.
As Clare Boothe Luce said, "no good deed goes unpunished." The State Department of Insurance ("the department") faulted Attorneys Insurance Mutual of Alabama, Inc. ("AIM"), for establishing loss reserves that were too conservative. AIM took a conservative financial approach during a period when many other companies were reckless. Perhaps our country's economy would be in better condition had more companies followed AIM's conservative example. As the main opinion expounds, I do not believe that the department provided "an explanation that rationally connects the facts and the decision reached." 64 So.3d at 20 (citing Alabama Dep't of Human Res. v. Dye, 921 So.2d 421, 426 (Ala.Civ.App.2005)). Therefore, I concur specially in that part of the main opinion labeled "Calculation of Loss Reserves."
As to the remainder of the main opinion, I concur in the result in that part of the main opinion labeled "Propriety of Installment Payments of Premiums." I concur in all other respects.
THOMPSON, Presiding Judge, concurring in part and dissenting in part.
I concur in all the portions of the main opinion except that pertaining to the loss-reserves issue. As to that issue, I respectfully dissent.
The main opinion, in reaching its conclusion that the trial court's affirmance of the commissioner's decision on the issue of loss reserves was arbitrary and capricious, has determined that, in the absence of a showing of harm to the insurance company or its policyholders, conservative loss reserves are reasonable. 64 So.3d at 20 (the trial court's decision was arbitrary because it was "based only on a dispute between actuaries about loss-reserve amounts with no proof that actual harm to AIM or its insureds will result from the higher loss reserves AIM has opted to use"). This court should not interfere with the department's oversight of insurance companies in the absence of action that is clearly arbitrary and capricious. See § 27-2-32(e), Ala.Code 1975; and Old Southern Life Ins. Co. v. State Dep't of Ins., 537 So.2d 30, 31 (Ala.Civ.App.1988). I believe that, with regard to the issue of loss reserves, the majority of this court is substituting its own opinion for that of the department and the commissioner in a matter peculiarly within the expertise of the department, which is charged with overseeing insurance companies in Alabama.
This court has explained
"that judicial deference to an administrative agency tends to insure uniformity and consistency of decisions in light of the agency's specialized competence in the field of operation entrusted to it by the legislature. Because of the specialized competency and the uniformity of decisions, a court frustrates legislative intent and usurps the discretionary role by stepping in when the agency's choice is not clearly unreasonable or arbitrary."
Alabama Dep't of Pub. Health v. Perkins, 469 So.2d 651, 652-53 (Ala.Civ.App.1985). In cases involving decisions by an administrative agency, this court is required to defer to the agency and presume that its decisions are correct. State Dep't of Human Res. v. Gibert, 681 So.2d 560, 562 (Ala.Civ.App.1995) ("Our standard of review requires that we review an agency's decisions with a presumption of correctness, especially where the subject matter is peculiar to the field of competence that has been entrusted to the agency by the Alabama Legislature.").
*24 In its discussion of the facts underlying the parties' dispute over the loss-reserves issue, the commissioner's decision states:
"8. Compliance with SSAP 55:
"In accordance with SSAP 55, the Department recommends that AIM move toward a more reasonable range in recording reserves for losses and loss adjustment expenses. (Exam Rep. pg. 34). AIM contends the range developed by its actuary was deemed appropriate by [its accountants/auditors] and the entire process complied with SSAP 55 (AIM's Brief, pg. 20). The Department asserts an actuary is the most qualified to offer an opinion regarding compliance with SSAP 55. An actuary has far more training and experience in determining the reasonableness of reserves and the proper designation for these liabilities. In regards to loss and [loss adjustment expenses] reserves, an actuary's training and experience far exceeds that of an accountant's.
"Mr. Randall Ross (`Ross'), ACAS, MAAA, the Department's consulting actuary, testified the degree of redundancy to [AIM's] reserves is quite clear and AIM has used a methodology that is based on a [pricing] approach rather than an actuarial reserving approach.[[13]] (Tr. 78). Mr. Ross also testified that in viewing AIM's financial statements, [AIM] has booked on or around $7 million in reserves year after year and something more in the order of $2 million to $3 million has been appropriate and that a margin of 154 percent is not considered to be reasonable. (Tr. 78, 79). Therefore, AIM is ordered to comply with examination report with respect to SSAP 55."
The department presented evidence indicating that AIM's loss reserves were redundant and were 154% above a "reasonable" level of loss reserves, according to applicable accounting and actuarial principles, for the period in question. According to the department's evidence, a reasonable but still conservative approach to loss reserves would have been approximately 20% above the reasonable estimate of loss reserves as determined by its actuary. In response, AIM presented evidence indicating that its accountants believed that AIM had complied with SSAP 55 and that its conservative approach to loss reserves was appropriate. However, AIM did not present evidence tending to question or challenge the department's determination of reasonable loss reserves for the period at issue.
AIM and the amici curiae have advanced a number of well-reasoned policy arguments in support of AIM's conservative approach to loss reserves. In essence, they point out that AIM is a small insurer attempting to provide protection for all possible contingencies for its policyholders and to manage itself in a manner designed to ensure its continued viability as a low-cost source of malpractice insurance for attorneys who otherwise might not be able to obtain that coverage from other insurers.
AIM's arguments on the issue of loss reserves are, in summary, that a conservative approach to loss reserves is reasonable. Indeed, my first impression of the dispute on the issue of loss reserves was to *25 wonder what objection the department might have to AIM's conservative management of its loss reserves. Clearly, loss-reserve estimates that are too low to be reasonable are a matter of serious concern. Indeed, the department presented no evidence indicating that AIM was damaged by its conservative estimation of loss reserves.[14] Regardless, I cannot agree with the implicit argument in AIM's brief that this court should ignore the department's requirement that loss reserves be reasonable merely because a company's loss reserves are overstated rather than understated. It is the responsibility of the department, and not of the courts, to regulate and examine insurers in this state.
The department presented evidence indicating that one goal and purpose of the periodic examinations that the department is required to conduct is an attempt to ensure, among other things, that loss reserves are reasonable. The department presented evidence indicating that AIM's loss reserves were conservative but not reasonable. Although many might question why a conservative approach to loss reserves might not be seen as advisable, that inquiry is not the proper issue before this court. Rather, this court is, and the trial court was, required to determine whether the decision of the commissioner was just and reasonable or whether it was instead arbitrary and capricious. See § 27-2-32(e), Ala.Code 1975; and Old Southern Life Ins. Co. v. State Dep't of Ins., 537 So.2d at 31. I might not have reached the same decision as did the commissioner. However, keeping in mind the specialized function of the department to regulate all insurers in the State, and after reviewing the record and considering the arguments of the parties, I cannot agree with the main opinion that the commissioner's decision on the issue of loss reserves was arbitrary and capricious. I would affirm the trial court's judgment affirming the decision of the commissioner on the issue of loss reserves. Therefore, I dissent from that portion of the main opinion that reverses the trial court's judgment as to that issue.
NOTES
[1] The department did not appeal that part of the commissioner's decision in favor of AIM to the trial court. Accordingly, this opinion does not address those issues.
[2] No issue has been raised pertaining to the propriety of receiving a legal retainer for non-legal services, and we have not considered the question.
[3] The record does not contain a full copy of SSAP 55. Rather, the parties read into evidence only the portions of that standard that they contend govern this matter. Paragraph 8 of SSAP 55 reads as follows:

"The liability for claim reserves and claim liabilities, unpaid losses, and loss claim adjustment expenses shall be based upon the estimated ultimate cost of settling the claims, including the effects of inflation and other societal and economic factors. Using past experience adjusted for current trends and any other factors that would modify past experience, these liabilities shall not be discounted unless authorized for specific types of claims by other SSAPs."
SSAP 55, paragraph 9, provides:
"Various analytical techniques can be used to estimate the liability for [incurred but not reported] claims, future development on reported loss claims and loss claim adjustment expenses. These techniques generally consist of statistical analysis of historical experience and are commonly referred to as the loss reserve projection. The estimation process is generally performed by line of business, grouping contracts with like characteristics and policy provisions. The decision to use a particular projection method and the results obtained from that method shall be evaluated by considering the inherent assumptions, underlining the method, and the appropriateness of those assumptions to the circumstances. No single projection method is inherently better than any other in all circumstances. The results of more than one method should be considered."
[4] Specifically, Ross stated:

"The reportthe version of the report right now represents a significant compromise from the original report language in which we had an adjustment to reserves. After extensive discussions and compromise with [AIM's actuary, who spoke] on behalf of [AIM] in these discussions, we agreed to take the adjustment to the liabilities out of the examination report and instead agreed to work toward a more reasonable reserve going forward.
"This is athis is a compromise I believe that [the actuary] is fine with conceptually.... Apparently, [AIM], it's my understanding, wanted to havewanted to have that agreement off the record out of the report. However, the examiners felt that it was important to have some recommendation in the report so that we could ensure going forward [that AIM] is complying with that agreement that they move toward a more reasonable range in accordance with SSAP 55."
[5] Frost explained the determination reached by AIM's actuary as follows:

"I will say that the actuary compiled historical data provided by AIM. They compiled a data base of AIM's losses historically since inception of the company. They then compared that to industry standards that they obtained from AM Best 2005 aggregates and averages. And they selectthe actuary then made his selection of which factors he thought were appropriate to calculate the reserve. And in my opinion, that complies with paragraph eight of SSAP 55.
"He also did not use undiscountedhe did not discount the reserves, which is also in accordance with paragraph eight....
"And in AIM's situation, the actuary usedultimate losses were projected used in a paid loss development method, a reported loss development method, and an unexpected loss ratio method. In other words, he used various different methods.
"AIM only has one line of business, so that portion of the paragraph nine does not apply.
"The actuary then selected the best estimate in the maximum reasonable ultimate losses based on the results of the various methods, and he projected a range of those losses, and he made reasonable checks. And then the company selected from that range their estimate of losses and [reserve]. So, in my opinion, the company complied with paragraph nine of SSAP number 55."
[6] Specifically, AIM argues in its brief submitted to this court:

"Further, while generally the department's Order shall be considered just and reasonable, this particular decision centers around issues of law and not issues of fact. Therefore, both parties agree that the department's decision on these questions of law, and that of the Circuit Court, is not entitled to a presumption of correctness and the application of the law to the facts is reviewed by an appellate court de novo. (R. 15; 34). Folks v. Tuscaloosa County Credit Union, 989 So.2d 531, 535 (Ala.Civ.App. 2007) (`However, when the trial court improperly applies the law to facts, no presumption of correctness exists as to the trial court's judgment.... A trial court's conclusions on legal issues carry no presumption of correctness.... This court reviews the application of law to facts de novo.'); see also Med. Licensure Comm'n of Alabama v. Herrera, 918 So.2d 918, 926 (Ala.Civ.App. 2005) (`[W]e note that there is no presumption of correctness afforded to the Commission's legal conclusions or its application of the law to the facts.'); see also DiBiasi v. Joe Wheeler Elec. Membership Corp., 988 So.2d 454, 459-60 (Ala.2008) (`[U]nder our standard of review, this Court does not afford the trial court's conclusions of law any presumption of correctness.')."
[7] In its briefs submitted to this court, AIM has not argued that the phrase "who is charged with the duty of investing or handling the insurer's funds" modifies the preceding "[a]ny officer, or director...." in § 27-27-26(a), Ala.Code 1975, so as to make that subsection applicable only to officers or directors who invest or handle a company's funds. AIM did not assert in its briefs submitted to this court that Moses does not "invest" or "handle" AIM's funds, although it did briefly assert that argument during oral argument before this court. As discussed earlier in this opinion, the evidence in the record before this court indicates that Moses signs some checks for AIM and that he, at a minimum, ensures compliance with AIM's investment policy. Because the issue has not been properly argued before this court, we do not need to determine the applicability of the phrase "who is charged with the duty of investing or handling the insurer's funds" or whether the services Moses has provided AIM fall within the purview of that phrase.
[8] The commissioner found that "a contract-based expectancy of payment from the assets of an insurer surely amounts to being `pecuniarily interested' in the insurer's `property' assetsfrom which payment is to be made."
[9] Among other things, AIM asserts in its brief on appeal:

"Additionally, Ala.Code § 27-27-26(c) is not intended to prohibit compensation to an officer, as alleged by the department. Instead, it is intended to provide an exception or `safe harbor' for certain types of transaction-based compensation that would otherwise be prohibited under subsection (a) of this statute. Ala.Code § 27-27-26(c) would allow a director to perform legal services for a fee in connection with a transaction described in subsection (a) of the statute. The department and the [commissioner] contend that since this provision does not explicitly allow such compensation to an 'officer' providing legal services and since Mr. Moses is compensated for, among other things, his duties as an officer, such compensation is therefore prohibited. (C. 559-607, 798-821). However, this reading by the department ignores the basic statutory interpretation principle that a statute should be read and construed as a whole so that all sections harmoniously work together. Karrh v. Bd. of Control of Employees Retirement System of Alabama, 679 So.2d 669, 672 (Ala. 1996). Reading the statute as a whole, the [commissioner's] finding overlooks the fact that this provision (c) only provides exceptions for compensation that is otherwise prohibited by Ala.Code § 27-27-26(a). It does not relate to compensation that is not transaction-based, and, therefore, not prohibited by Ala.Code § 27-27-26(a). As previously discussed, the arrangement between AIM and Charles Moses is not transaction-based and, therefore, not prohibited by Ala.Code § 27-27-26(a). Therefore, the exception in subsection (c) is irrelevant, inapplicable and meaningless in this context."
(Emphasis in original.)
[10] We reject AIM's arguments based on the purported applicability of the Alabama Business Corporation Act ("the Act"), § 10-2B-1.01 et seq., Ala.Code 1975 (now amended and renumbered by Act No. 2009-513, Ala. Acts 2009, effective January 1, 2011). Section 10-2B-1.01(b) (now amended and renumbered as § 10A-2-1.01(b), effective January 1, 2011), provides that the Act applies to insurance companies only to the extent that it does not conflict with statutes specifically governing insurance companies. As the commissioner noted in his August 28, 2008, decision:

"AIM's arguments about general corporate behavior and the fiduciary obligation/conflict of interest aspects of the Alabama Business Corporation Act (AIM's Brief pp. 6-7) are best addressed to the Legislature. While, arguably, those provisions of the Business Corporation Act may be adequate in the context of insurance companies, the Legislature has seen fit to impose additional restrictions on insurance companies in the form of § 27-27-26. Until the Legislature decides to repeal that statute, AIM and other insurers must comply with it even if it disallows arrangements which might be permissible under the Business Corporation Act."
[11] The insurance policies, and the insurance forms submitted by AIM to the department for approval, see § 27-14-8(a), Ala.Code 1975, provided that AIM's policyholders pay their premiums in annual lump-sum amounts. AIM does not dispute that, by failing to file appropriate forms with and to seek approval from the department of its installment-payment practice, it failed to comply with § 27-14-8(a), Ala.Code 1975.
[12] We note that the department represents in its brief submitted to this court that alterations to the examination report will be made after the completion of the appellate process.
[13] The word "pricing" was omitted from the commissioner's August 28, 2008, decision. However, the citation to the transcript indicates that the word was inadvertently omitted. Ross's specific testimony, in pertinent part, was that "[t]he degree of redundancy in the company's reserves is quite clear, and they have used the consistent methodology over the years to establish their reserves, a methodology that's based more on a pricing approach than an actuarial reserving approach."
[14] The commissioner noted that the overstatement of loss reserves could affect, among other financial issues, an insurance company's tax liability.